Kenneth Dale ROBERSON,
Plaintiff-Appellant,

v.

LORETTO CASKET COMPANY and
Federal Kemper Insurance
Company, Defendants-Appellees.

Supreme Court of Tennessee,
at Nashville.

Dec. 22, 1986.

David Comer, Lawrenceburg, for plaintiff-appellant.

Jerry C. Colley, Columbia, for defendants-appellees.

## OPINION

DROWOTA, Justice.

In this Worker's Compensation case, the Lawrence County Circuit Court awarded Plaintiff, Kenneth D. Roberson, permanent partial disability benefits for 95% impairment to his right eye, a scheduled member under T.C.A. § 50–6–207(3)(A). The Plaintiff had appealed as of right, challenging the trial court's denial of additional tempo-

rary total benefits and the award of benefits based on impairment to only one eye rather than to his entire visual field. The Defendants, Loretto Casket Co. and Federal Kemper Insurance Co., have filed a Motion for Frivolous Appeal.

The facts are simple. Plaintiff was about 28 years old as of October 4, 1982, the date of the accident, and had been working in Defendant's wood room since July, 1981. By the time of trial, he had earned a bachelor's degree in marketing; he had been working in Defendant's wood room while attending the University of Northern Alabama at Florence. On October 4, 1982, Defendant was using the wood room employees to fix leaks in the roof of the plant. Plaintiff, a foreman, and several other employees were removing and replacing sheet metal on the roof. The work involved using two types of hammers, one to pull nails and the other to drive them. While hammering, the head of a nail shattered and a sliver of metal was sent into Plaintiff's right eye, penetrating it just below the pupil and in the iris. It traveled through the lens, forming a traumatic cataract, and passed entirely through the globe of the eye. Plaintiff notified the foreman and was taken to the office of Dr. Milton C. Ambrose immediately following the accident.

Dr. Ambrose, an opthalmologist, examined and repaired the corneal laceration on the day of the accident and referred Plaintiff to Dr. Charles, a retinologist in Memphis, for surgery to repair the intraocular damage and to remove the sliver of metal. After surgery by Dr. Charles on October 7, 1982, Dr. Ambrose continued to treat Plaintiff's injury. From October 4, 1982, to January 2, 1983, Plaintiff received temporary total disability benefits. Having been released for work on January 2, Plaintiff returned to work with some temporary restrictions on lifting and with the advice that he should avoid exposure to eye irritants. Working on a part-time basis while attending school, Plaintiff continued in Defendant's employ until September 16, 1983. On September 16, his employer ordered

him to assist in the unloading of lumber from freight cars. In a previous episode of unloading lumber, stirred dust had irritated Plaintiff's injured eye. When he resisted exposing himself to a probable recurrence of eye irritation, his employer told him that if he couldn't do the job as required, he was not needed. Believing he had been terminated, Plaintiff left the plant and, as of the time of trial on March 24, 1986, he had not been able to find other employment, despite earnest efforts to do so.

At trial, the only witnesses to testify were Plaintiff and, by deposition, his two medical experts. Plaintiff testified to the circumstances of the accident and stated that prior to this incident he had experienced no visual impairment; however, he had been treated for allergies from about 1977 and these had continued to some degree throughout the period of his employment with Defendant. These allergies primarily affected his eyes and nose. As a result of the accident, his vision was reduced from 20:20 to 20:400 in his right eye, unaided, but with the fitting of a soft contact lens, his vision was improved significantly. Unassisted, all he can discern with his right eye is light perception. In addition, the injury sensitized his eye to dust or eye irritants and the contact lens tends to aggravate his allergies. His eye is also now sensitive to light and he has been instructed to wear darkened safety glasses most of the time. He stated that he can still see well out of his left eye but that, due to his allergies, he cannot wear the contact in his right eye at all times, particularly during the Spring and Fall or when eye irritants are present. Prior to the accident, he had experienced some aggravation of his allergies due to the dusty environment of the plant, but he had not been prevented from working. After the injury, whenever the eye became irritated, it would blur and develop a film over it, impairing the utility of the contact lens and sometimes preventing him from wearing it altogether. When he unloaded lumber on one occasion prior to September 16, he had to see his allergist the following day to have his injured eye irrigated and medicat-

ed, preventing him from wearing the contact lens for several days. After his apparent termination on September 16, 1983, Plaintiff attempted to find other employment. He maintained, at the direction of his attorney, a diary in which he recorded the employers with whom he had sought work. He had been unable to secure employment as of the date of trial in March, 1986.

Dr. Ambrose testified that he treated Plaintiff for a corneal laceration on October 4, 1982. He stated that Plaintiff's vision in his right eye has been reduced to light perception. He has seen Plaintiff regularly since his injury and stated that Plaintiff reached his maximum medical recovery as of January 2, 1983, when he was released to return to work. Due to the nature of the injury, continued care and treatment will be necessary for Plaintiff's eye during the rest of his life; he has been left susceptible to post-traumatic glaucoma and retinal detachment. As a result of the injury, Plaintiff lost 95% of his visual acuity in his right eye. With the contact lens, however, this loss has been reduced to 55%, but if he should become unable to wear the contact lens, he would lose the binocular status of his eyes. When a person loses sight in one eye, a certain impairment to the entire visual field of both eyes will result and if Plaintiff did become monocular from inability to tolerate the contact lens, the kinds of work available to him would be limited because he would lose his depth perception. Dr. Ambrose was of the opinion, nevertheless, that chances were good that Plaintiff would not experience further complications. He concluded that "the patient under consideration will do well in any type of employment, except employment that might tend to contaminate his contact lens, such as an extremely dusty environment, or an environment ... that might affect the wearing of his contact lens."

Also testifying for Plaintiff was Dr. James E. Mallette, Jr., an allergist. He stated that Plaintiff had first come to see him for treatment of his allergies in 1977.

He has continued to treat him and last saw him in August, 1985. He had seen Plaintiff on at least one occasion in 1980 to treat him for dust irritation caused by his work environment. Because Plaintiff has a chronic allergic condition, a contact lens would tend to be an irritant to some extent; moreover, Dr. Mallette was of the opinion that the injury has left his eye more sensitive to his allergies, making inflammation worse and necessitating avoidance of exposure to dust. The injury combined with the allergies would interfere with his ability to see out of his contact lens when exposed to irritants.

The trial court found that Plaintiff reached his maximum medical recovery on January 2, 1983, and thus his eligibility for temporary total disability benefits was terminated as of that date. All medical expenses had been paid and any future medical expenses would be payable. The trial court assessed a 95% permanent partial disability in Plaintiff's right eye, ordering benefits for 95 weeks pursuant to T.C.A. § 50–6–207(3)(A)(ii)(q). The trial court rejected Plaintiff's contention that since he was terminated on September 16, 1983, due to the incapacity caused by his injury, his eligibility for temporary total benefits revived. Further, the trial court also refused to award benefits based on loss to the entire visual field under T.C.A. § 50–6–207(3)(A)(ii)(ff). The Plaintiff has appealed the determinations of the trial court. The standard of review in this case is under the material evidence rule. *Alley v. Consolidation Coal Co.*, 699 S.W.2d 147, 148 (Tenn.1985).

Plaintiff contends that because he was terminated as a result of his incapacity from his work-related injury, his eligibility for temporary total disability benefits revived as of September 16, 1983. He argues that his temporary total disability benefits should continue for as long as his injury prevents him from working. Since his injury has not yet permitted him to return to work without restriction and having been unable to find work, either he continues to be eligible for temporary total disability benefits or, alternatively, the injury result-

ed in a total loss of earning capacity and thus he is eligible for permanent total disability benefits.

■ Plaintiff's proposed construction of the Worker's Compensation Act (the Act) is contrary to the terms of the Act itself and cannot be supported by the case law. Since at least the decision in *Redmond v. McMinn County*, 209 Tenn. 463, 354 S.W.2d 435 (1962), this Court has recognized that the Act provides for four types of disability, each serving a specific compensation purpose. Temporary total disability "refers to the injured employee's condition while disabled to work by his injury and until he recovers as far as the nature of his injury permits...." 209 Tenn. at 468, 354 S.W.2d at 437. "Certainly, there is a time when temporary total disability ends, and a determination can be made with reasonable certainty as to whether the condition of Petitioner would respond to further treatment or whether his disability is permanent." *Insurance Co. of North America v. Lane*, 215 Tenn. 376, 392, 386 S.W.2d 513, 520 (1965). *See also, e.g., Shores v. Shores*, 217 Tenn. 96, 103, 395 S.W.2d 388, 391 (1965). T.C.A. § 50–6–207(3)(A)(i) specifically provides that the injured employee shall receive compensation "for the period of time during which he suffers temporary total disability on account of the injury," and thus the purpose served by such benefits is to allow for

> "the healing period during which the employee is totally prevented from working. Under the rule ... the temporary total disability period is cut off when the workman has reached its maximum recovery, at which point either permanent total or permanent partial disability commences...."

*Gluck Bros., Inc. v. Coffey*, 222 Tenn. 6, 13–14, 431 S.W.2d 756, 759 (1968). Accordingly, temporary total disability benefits "are terminated either by the ability to return to work or attainment of maximum recovery." *Simpson v. Satterfield*, 564 S.W.2d 953, 955 (Tenn.1978).

In this case, the undisputed evidence shows that Plaintiff reached maximum medical recovery on January 2, 1983, and thereafter returned to work; Plaintiff's condition will not respond to further medical treatment. He was able to work and did work until September 16, 1983. Clearly, the trial court correctly applied the law to these facts when it ruled that temporary total disability benefits had been properly terminated as of January 2, 1983. Eligibility for these benefits is not revived because of a subsequent termination where the proof demonstrates without contradiction that the employee not only had reached maximum recovery but had returned to work as well. The trial court's decision is amply supported by the evidence. *Cf. Shores v. Shores, supra,* 217 Tenn. at 102–103, 395 S.W.2d at 391 (Where evidence conflicted concerning when temporary total benefits should end, the trial court's decision based on material evidence will generally stand.).

Furthermore, Plaintiff's insistence that he is nevertheless eligible for permanent total disability because his injury prevented him from working for Defendant is not supported by the evidence or the law. Although he claims that he sought employment from some 400 employers, evidenced by a diary of employer contacts, and has been unable to secure work since his termination on September 16, 1983, the record does not support an inference that Plaintiff's inability to find employment is the inability to work. No evidence shows that he was refused employment because of his injury. As observed by this Court in *Ware v. United States Steel Corp.,* 541 S.W.2d 107, 109 (Tenn.1976), "the all pervading purpose of the Workman's compensation laws is to substitute compensatory income for loss of earning capacity.... But it must be borne in mind that the terms 'loss of earning capacity' and 'loss of earnings' are not synonymous." (citations omitted) To be considered permanently and totally disabled, T.C.A. § 50–6–207(4) requires that a person be totally incapacitated from working at an occupation that brings him an income. *See Prost v. City of Clarks-*

*ville Police Department,* 688 S.W.2d 425, 427 (Tenn.1985). The assessment of permanent total disability is based upon numerous factors, including the employee's skills and training, education, age, local job opportunities, and his capacity to work at the kinds of employment available in his disabled condition. *See Holder v. Liberty Mutual Insurance Co.,* 587 S.W.2d 372, 374 (Tenn.1979). Thus, extent of disability is a question of fact and the trial court's determination will not be reversed if it is based on material evidence in the record.

In addition, the "statute contemplates employment in the open labor market and not a return to the employee's previous position." *Prost v. City of Clarksville Police Dept., supra,* at 427. While his employer's reaction to Plaintiff's justifiable resistance to exposure to dust, when it would risk aggravating his work-related injury, may have been callous and unreasonable, this does not show he could not obtain other work due to his disability, and the circumstances of his termination of itself do not conclusively demonstrate on this record that he was terminated because of his disability. Not only did Plaintiff fail to demonstrate that he was refused employment elsewhere because of his disabled condition, but the evidence shows that he had worked for over eight months since January 2, 1983, that he was 32 years old at the time of trial, able-bodied (except for his injured right eye), and that he had a college education; one of his own experts stated that his disability would not prevent him from working in conditions that would not expose him to eye irritants. Considering the record before us, the trial court was fully justified in limiting its determination of the extent of disability:

> "[T]he fact of employment after an injury, the earning power of the injured workman, and his earnings are to be taken into consideration along with all other factors involved, to include whether the employee, in the light of his education, his physical and mental abilities, or the lack thereof, is employable in the open labor market."

*Ware v. United States Steel Corp., supra,* at 110–111.

■ Plaintiff's second issue is related and similar to the issue of whether Plaintiff has been permanently and totally disabled for the purposes of the Act. Citing T.C.A. § 50–6–207(3)(A)(ii)(ff), which provides compensation "[f]or the total and permanent loss of the sight of both eyes," Plaintiff argues that considering that his entire visual field has been adversely affected due to the loss of sight in one eye, he should receive benefits under this provision rather than being limited to T.C.A. § 50–6–207(3)(A)(ii)(q), which covers loss of sight in only one eye. With some logic, Plaintiff contends that the effects of the injury have extended beyond its locus to affect his ability to see and thus his capacity to work, due to the loss to his visual field (losing the binocular status of his eyes). In this case, he argues that limiting recovery to only one eye would be inequitable under the Act.

The Legislature has expressly provided a schedule for the compensation "of disability partial in character but adjudged to be permanent," T.C.A. § 50–6–207(3)(A), and "where the only injury is to a scheduled member, the scheduled benefits are exclusive and prohibit an award of permanent partial disability to the body as a whole." *Genesco, Inc. v. Creamer,* 584 S.W.2d 191, 193 (Tenn.1979) (citation omitted). This rule is equally applicable to this case, considering both that the Act distinguishes between loss of one eye and loss of sight in both eyes and provides for the same number of weeks of compensation for injuries to the body as a whole as for those under T.C.A. § 50–6–207(3)(A)(ii)(ff). We are not unaware of the apparent arbitrariness associated with any attempt to schedule or categorize benefits for injuries to a human being, but it would "take a work of legal artistry to state a comprehensive rule which will adequately resolve all the problems inherent in permanent partial loss of use cases...." *Aerosol Corp. of the South v. Johnson,* 222 Tenn. 339, 346, 435 S.W.2d 832, 835 (1968). We cannot ignore the express provisions of the Act:

"The compensation law of this State contains a schedule of injuries to members of the body; and this schedule governs as to what award, if any, shall be made to one sustaining either total or partial loss, or loss of use, of a member scheduled. Under this statutory system, such award is not measured by dimunition of the employee's earning capacity; and equally so, the award for loss of use of a member is measured by the value fixed in this statute, or a percentage thereof in case of less than total permanent loss of use."

*Aerosol Corp. of the South v. Johnson, supra,* 222 Tenn. at 343, 435 S.W.2d at 834. *See also Blackburn v. Allied Chemical Corp.,* 616 S.W.2d 600, 602 (Tenn.1981); *Industrial Coated Products of America, Inc. v. Buchanan,* 224 Tenn. 69, 73–74, 450 S.W.2d 566, 568 (1970); *Shores v. Shores, supra,* 217 Tenn. at 101–102, 395 S.W.2d at 390.

To adopt Plaintiff's theory on the facts of this case would render T.C.A. § 50–6–207(3)(A)(ii)(q) meaningless, since every case involving a blinding injury to one eye would necessarily impair the visual field, and would contradict the terms of T.C.A. § 50–6–207(3)(A)(ii)(ff), which provides for the loss of sight in both eyes. Plaintiff retains unimpaired vision in his left eye. He testified that he can see well from this eye, although it is sympathetically affected to some degree whenever the right eye experiences allergic reactions. Dr. Ambrose was of the opinion that the potential for sympathetic opthalmia was not significant, but he did rate the impairment to Plaintiff's entire visual field (that is, both eyes) at 24%. If his injured eye does become intolerant of the corrective contact lens, Plaintiff will lose his depth perception. Nevertheless, Dr. Ambrose believed that Plaintiff would not experience problems with his left eye. In short, the trial court was justified in restricting the award of benefits to the scheduled member because there is little or "no evidence ... lay or medical, to take this case out of the schedule contained in the statute...."

*Genesco, Inc. v. Creamer, supra,* at 191. The trial court's assessment of 95% disability under T.C.A. § 50–6–207(3)(A)(ii)(q), based on the unassisted visual impairment to Plaintiff's right eye, *Aerosol Corp. of the South v. Johnson, supra,* 222 Tenn. at 342, 435 S.W.2d 832, is supported by material evidence.

Finally, Defendants have filed a Motion for Frivolous Appeal T.C.A. § 27–1–122. We do not agree, however, that this is an appropriate case for the award of damages for a frivolous appeal. The motion is denied.

Accordingly, we affirm the judgment of the trial court in this case. The costs of the appeal are taxed to Plaintiff.

BROCK, C.J., and FONES, HARBISON and COOPER, JJ., concur.