Shirley DRENNON, Plaintiff/Appellee,

v.

**GENERAL ELECTRIC COMPANY &**
**Electric Mutual Liability Insurance**
**Company, Defendants/Appellants.**

Supreme Court of Tennessee,
Special Workers' Compensation Appeals
Panel at Knoxville.

Aug. 19, 1994.

Mark C. Travis and Joseph J. Doherty, Wimberly & Lawson, Morristown, for appellants.

Douglas R. Beier, Morristown, for appellee.

Members of Panel: CHARLES H. O'BRIEN, Justice, Supreme Court, PENNY J. WHITE, Judge, and WILLIAM M. DENDER, Senior Judge.

## MEMORANDUM OPINION

DENDER, Senior Judge.

This workers' compensation appeal has been referred to the Special Workers' Compensation Appeals Panel of the Supreme Court in accordance with T.C.A. Section 50–6–225(e)(3) for hearing and report to the Supreme Court of findings of fact and conclusions of law.

The plaintiff, Shirley Drennon, filed suit against her employer, General Electric Company, and its insurance carrier, Electric Mutual Liability Insurance Company, for workers' compensation benefits because of injuries allegedly arising out of and in the course of her employment on October 1, 1990. The trial court awarded benefits, and the defendants have appealed.

The issues raised by the defendants are:

I. Did the medical proof establish that the plaintiff's alleged injury was an aggravation of her pre-existing condition?

II. Did the trial court err in sustaining the plaintiff's objection to the introduction of the medical deposition taken in plaintiff's prior workers' compensation proceeding?

The issue raised by the plaintiff is:

III. Whether the trial court correctly determined plaintiff's disability.

We conclude that none of the issues have any merit, and the judgement of the trial court is affirmed.

Plaintiff was 44 years of age at the time of trial, and she had been employed by General Electric for 15 years. She obtained a high school GED in 1972, and her work experience before General Electric was working in a garment factory for one year.

Plaintiff injured her left and right arms, hands and shoulders on the job on "August 25, 1980, September 19, 1980, June 16, 1981 and at various other times," and she had carpal tunnel release surgery on both arms in January, 1981. In June, 1981, plaintiff had thoracic outlet syndrome surgery on her right side, and she returned to work on January 11, 1982. She received a settlement for these injuries in 1984, with the order approving the settlement stating that the sum of $11,500.00 was "in full and final settlement of all temporary total, temporary partial, and permanent partial disability benefits." The order also stated it was one doctor's opinion that she suffered a "permanent partial disability of 16% percent to both hands which translates to 13% percent for both upper extremities which translates to approximately 7% percent permanent partial disability to the body as a whole as a result of her bilateral carpal tunnel syndromes and subsequent decompressive surgery," and that another doctor's opinion was that "plaintiff has sustained a 20% permanent partial disability to the body as a whole under certain conditions or only a 5% disability to the body as a whole under certain other conditions." Plaintiff worked at her job from January 11, 1982 until February 2, 1987.

The plaintiff was again injured on the job on February 2, 1987, when an air gun flew out of her hand and struck her. She again had thoracic outlet surgery in June, 1987, but this surgery was on her left side. She returned to work in March, 1988, and a judgment was entered concerning that injury on December 9, 1988. The judgment recited that "she sustained thereby a five (5) percent permanent partial disability to her right arm, elbow and shoulder, or two and one-half (2.5) percent to her body as a whole as a result of

said injury." Plaintiff worked at her job until October 1, 1990.

In February, 1990, G.E. moved plaintiff into the assembly area where she was required to put the inner parts into switch boxes which move along a conveyor belt. The job required the use of air guns to screw the parts inside the boxes. In the latter part of February, 1990, after working in the assembly area for approximately a week, plaintiff began waking up at night with pain in her arms. Her arms and hands would lose sensation and go numb and during the days she would be dropping things. Her condition deteriorated to the point that she was not able to perform even minor tasks. She immediately reported the problems to G.E., and she was sent to Dr. Harrison. He treated her and performed a carpal tunnel release procedure on her left arm on October 1, 1990. Dr. Harrison released plaintiff from his care in May, 1991, with 15 lbs. weight restrictions; and G.E. refused to permit her to return to work. Plaintiff's opinion was that she could not do anything for gainful employment in her current condition.

Dr. Nadolsky, a vocational consultant, testified by deposition and stated that plaintiff had been eliminated from 87 percent of the occupations in the local labor market that she could have performed prior to developing problems with her upper extremities in February, 1990.

Dr. Harrison testified by deposition, and in addition to describing his treatment of the plaintiff, the questions and answers in his deposition were as follows:

Q. On April the 29th, 1991, what did you do from a medical standpoint with respect to her bilateral carpal tunnel problem?

A. Therapeutically, we didn't do anything. We simply examined her and she indicated that her hands were not bothering her too much on that occasion unless she used them vigorously. And the objective evaluation of the upper extremities revealed no changes.

Q. Did you at that time form an opinion with respect to the degree of her permanent medical impairment as a result of the carpal tunnel syndrome bilateral?

A. I did that on the next visit, May the 9th, '91.

Q. I'm sorry. I didn't see that date. Have you formed an opinion with respect to the carpal tunnel surgery on the left arm which you operated on? Does she retain a permanent physical impairment in your opinion?

A. Yes. I wasn't aware of any prior therapies that had been or—at least impairments that had been rated for her on that occasion. But based on her overall objective evaluation I felt that on that occasion she had a permanent partial physical impairment of approximately five percent of the left upper extremity as a result of the carpal tunnel surgery on the left-hand side.

Q. And in forming that opinion of five percent permanent partial to the left upper extremity, did you use the most recent A.M.A. Guides?

A. Right. Right.

Q. What about the permanent impairment to her right upper extremity?

A. I felt that she did have a permanent partial physical impairment to the right upper extremity. I did not specifically rate her at that time as that had not been as dominate a complaint and I wasn't convinced that it had changed significantly from what she had had evaluated with her prior surgery.

Q. Do you have an opinion with a figure as to what her permanent impairment is for her right upper extremity?

A. Right upper extremity I think would probably be—If you had wanted me to evaluate her on the basis of her total permanent impairment I think in the left upper extremity would be in the vicinity of seven or eight percent of the left upper extremity, and on the right about five percent.

.    .    .    .    .

Q. Assume, Doctor, that the patient, in this case, Ms. Drennon, was asymptomatic, non-symptomatic, from 1981 until the time that she started using the heavy air gun that she related to you three or four months before she saw you, would she then, in your professional opinion, have

retained any permanent physical impairment from that 1981 surgery?

A. Yes. A mild degree, probably less than what I gave her.

Q. All right. And so if she retained a mild degree less than what you gave her, do you deduce that the surgery and the impairment rating that you gave her, the work that she was performing, aggravated that preexisting condition, the condition that she had prior to your seeing her?

A. Yes. That was basically the reason why I differentiated between the left and the right side.

Q. Can you as a physician deduce an individual such as Ms. Drennon who has bilateral carpal tunnel release in 1981 but then works unrestricted and is asymptomatic for six to seven, eight years—would you say in your professional opinion that her medical condition had been resolved?

A. During that period of time it had. As I was telling you earlier, I mean, you're talking about whether a new condition started or whether or not it's an aggravation of an old problem. It's analogous to a tooth being filled. You have a filling in your tooth that's good for seven or eight years, and then it breaks down again and it needs further work. And I think that's basically what happened on the left-hand side.

Defendants did not introduce any medical proof, but relied on copies of judgments for previous awards and alleged inconsistencies in plaintiff's testimony. We note that the previous judgments were entered on dates before the legislature mandated that all physicians rate disability according to uniform medical guidelines.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

■ We find the testimony of Dr. Harrison clearly sets forth that the injury in 1990 was either a new injury or an aggravation of pre-existing injuries; and that such resulted in additional permanent disability. The first issue has no merit.

We next consider the second issue raised by the defendants.

■ The defendants sought to introduce a discovery deposition of Dr. Hiroshi Toyohara, M.D., taken on September 20, 1983 in a 1981 workers' compensation suit, and the plaintiff objected on the grounds (1) it is a discovery deposition and can only be used to contradict or impeach the testimony of the deponent and (2) it is hearsay evidence in the present case. The trial court sustained the objection. In order for an appellate court to review a record of excluded evidence, it is fundamental that such evidence be placed in the record in some manner. *State v. Goad,* 707 S.W.2d 846 (Tenn.1986). Defendants accomplished this by filing the deposition and having it marked Exhibit 14; however, the discovery deposition is not part of the record before us. The case in which the deposition was taken and filed was compromised and settled; and an agreed order approving the settlement was entered. Apparently the discovery deposition was presented to the court by agreement to lay a foundation for the settlement, since Dr. Joe Beals and Dr. Hiroshi Toyohara had differing opinions about the disability of the plaintiff. Their opinions are set forth in the agreed order. There is no cross-examination in the trial sense in a discovery deposition. There was no ruling by the court that the deposition would be allowed in evidence; rather, the agreed order states, "The deposition of Dr. Toyohara has been filed and considered by the court." This does not necessarily mean that the entire deposition is proper evidence in either that case or this case.

The last sentence of Rule 32.01(3), Tennessee Rules of Civil Procedure, now reads:

Notwithstanding the foregoing provisions, depositions of experts taken pursuant to the provisions of Rule 26.02(4) may not be used at the trial except to impeach in accordance with the provisions of Rule 32.01(1).

■ This part of Rule 32.01(3) was not in existence at the time the discovery deposition was taken, but it was in full force and effect throughout the present case. The rules themselves are procedural and do not affect substantive rights. T.C.A. § 16–3–403.

Under the rules of statutory construction, statutes which address the specific are given precedence over those that address the general. *Watts v. Putnam County,* 525 S.W.2d 488 (Tenn.1975). The Tennessee Rules of Civil Procedure are "laws" and are subject to being superseded in the same manner as statutes. See *Tennessee Department of Human Services v. Vaughn,* 595 S.W.2d 62 (Tenn.1980).

■■■ We hold the last sentence of Rule 32.01(3), Tennessee Rules of Civil Procedure, prohibits the use of the discovery deposition of an expert for anything other than contradicting or impeaching the testimony of the deponent as an expert witness, regardless of whether the deposition was taken in the present case or in a previous case. We also hold the specific prohibition contained in the last sentence of Rule 32.01(3) is given precedence over the general exceptions to the hearsay rule contained in Rules 803 and 804, Tennessee Rules of Evidence; and therefore, the discovery deposition of Dr. Toyohara is not admissible as substantive evidence in the present case.

The second issue raised by the defendants/appellants has no merit.

We next consider the single issue raised by the plaintiff.

Plaintiff contends that the evidence preponderates against the findings of the court, and that the court should have found the disability of the plaintiff to be larger than that awarded.

■ The trial judge filed two detailed opinions in this case, which totaled eight legal pages in length. In the opinion filed on June 24, 1992, the trial judge set forth the method he used to calculate the vocational disability of the plaintiff. Contrary to plaintiff's brief, the opinion states that the trial judge determined the disability of each arm separately, then averaged those disabilities to arrive at a single disability for the scheduled injury of "loss of two arms other than at the shoulder," and then applied that average percent disability to 400 weeks. This is a proper method of calculating plaintiff's disability. See *Queen v. New York Underwrit-* *ers Insurance Co.,* 222 Tenn. 235, 435 S.W.2d 122 (1968).

In the opinion filed May 1, 1992, the trial judge discussed many factors such as age, education, training, job skills, work experience and job opportunities; and clearly he considered these factors in his determination of plaintiff's disability.

No issue has been made by either party concerning the lump sum payment of 50% of the total award to the plaintiff.

In *Miles v. Liberty Mutual Insurance Company,* 795 S.W.2d 665, 666 (Tenn.1990), the court said:

> The extent of an injured worker's permanent disability is an issue of fact. *Jaske v. Murray Ohio Manufacturing Company, Inc.,* 750 S.W.2d 150 (Tenn.1988). In determining the extent of the worker's disability, the trial judge is not required to accept without reservation an expert's opinion, but is charged with making an independent determination on consideration of such factors as age, education, training, job skills, work experience, and job opportunities available to a worker with the anatomical disability of plaintiff. See *Bradford v. Travelers Indemnity Company,* 762 S.W.2d 572 (Tenn.1988); *Roberson v. Loretto Casket Co.,* 722 S.W.2d 380 (Tenn.1986); *Prost v. City of Clarksville,* 688 S.W.2d 425 (Tenn.1985).

The standard of review by this court of the findings of fact by the trial court is de novo upon the record of the trial court, accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise. T.C.A. § 50–6–225(e)(2).

■ The evidence does not preponderate against the findings of the trial court concerning the vocational disability of the plaintiff. The issue raised by the plaintiff has no merit.

We find no merit in any of the issues, and we therefore affirm the judgment of the trial court and remand to the trial court for all necessary proceedings consistent with this opinion.

Costs of this appeal are taxed to the defendants/appellants.

CHARLES H. O'BRIEN, Justice, and PENNY J. WHITE, Judge, concur.