

FILED

June 28, 2017

TN COURT OF
WORKERS' COMPENSATION
CLAIMS

Time 8:11 AM



### TENNESSEE BUREAU OF WORKERS' COMPENSATION
### IN THE COURT OF WORKERS' COMPENSATION CLAIMS
### AT MURFREESBORO

| | |
|---|---|
| **WILLIAM BAUMGARDNER,** | **Docket No.: 2015-05-0619** |
| **Employee,** | |
| **v.** | |
| **UPS,** | **State File No.: 89624-2014** |
| **Employer,** | |
| **And** | |
| **LIBERTY MUTUAL,** | **Judge Dale Tipps** |
| **Insurance Carrier.** | |

---

### COMPENSATION HEARING ORDER

---

This matter came before the undersigned Workers' Compensation Judge on June 20, 2017, for a Compensation Hearing pursuant to Tennessee Code Annotated section 50-6-239 (2016). The central legal issues are: (1) whether William Baumgardner is permanently and totally disabled as a result of his injuries; (2) if he is not totally disabled, to what permanent partial disability benefits is he entitled; and (3) whether he is entitled to a new panel of orthopedic physicians. For the reasons set forth below, the Court holds that Mr. Baumgardner established by a preponderance of the evidence that he sustained a compensable left-knee injury and is entitled to medical benefits, including a panel of orthopedic specialists. The Court further holds Mr. Baumgardner failed to meet his burden of establishing entitlement to permanent disability benefits.

### History of Claim

*Stipulations*

UPS stipulated to the following: Mr. Baumgardner sustained a compensable injury by accident arising out of and in the course and scope of his employment as a delivery driver on November 11, 2014. He gave proper notice of the injury and received authorized medical treatment with Dr. James Rungee. UPS further stipulated that it was unable to return Mr. Baumgardner to work because of the permanent restrictions assigned

1

by Dr. Rungee.

*Mr. Baumgardner's Trial Testimony*

Mr. Baumgardner testified that he never had any left-knee problems or medical treatment prior to November 11, 2014. While delivering a package on that day, he defended himself from an aggressive dog. He twisted his left knee in the process and felt immediate pain. He tried to keep working but soon had to call his supervisor, who sent a replacement driver and took Mr. Baumgardner for medical treatment with Dr. Martin Glynn. After treating Mr. Baumgardner for a few days, Dr. Glynn ordered a left-knee MRI, which led to an orthopedic referral. UPS provided an orthopedic panel, from which Mr. Baumgardner selected Dr. James Rungee.

Mr. Baumgardner saw Dr. Rungee several times but said his bedside manner "left a lot to be desired." He felt that Dr. Rungee was rushed and uninterested in discussing his condition. He estimated Dr. Rungee spent about ten minutes with him at each visit.[1]

After Dr. Rungee assigned permanent restrictions in April 2015, UPS asked Mr. Baumgardner to go through their Americans with Disabilities Act process. He did so, but UPS was unable to accommodate his restrictions. As a result, Mr. Baumgardner requested his pension and retired from UPS, although he had intended to work at least ten more years until he was sixty-seven. He has not worked anywhere since then. He has not sought work anywhere else because he does not feel he is able to work in light of Dr. Rungee's restrictions.

*Medical Records and Deposition Testimony*

Mr. Baumgardner first saw Dr. Rungee on December 8, 2014, for complaints of aching pain in the lateral aspect of his left knee. Dr. Rungee noted very little effusion and no medial tenderness. However, Mr. Baumgardner was "tender along the course of the lateral collateral ligament and has pain with stress of that. He has a negative drawer or Lachman. He can flex to 120 degrees and fully extend." The MRI showed "some edema in the lateral collateral ligament as well as over the lateral femoral condyle consistent with a stress injury to that side. He is also noted to have a medial meniscus tear." Dr. Rungee diagnosed a lateral collateral ligament strain, lateral femoral condyle contusion, and medial meniscus tear. He told Mr. Baumgardner that his lack of medial symptoms "may suggest that his medial meniscus tear was preexistent to the injury." He also recommended a knee brace and additional physical therapy. Dr. Rungee noted a brief discussion about an arthroscopy as the usual treatment for a medial meniscus tear, but he "would not consider doing that unless this was symptomatic."

---

[1] This testimony was echoed by Kathy McBroom, who attended all of his medical appointments.

2

Dr. Rungee saw Mr. Baumgardner several times over the next few months. He continued to provide conservative treatment, such as physical therapy and injections. He also consistently observed no medial pain or tenderness. Following a functional capacity evaluation (FCE), Mr. Baumgardner last saw Dr. Rungee on April 1, 2015. Dr. Rungee noted no malalignment, no effusion, and 130 degrees of flexion. His impression was "left knee strain with asymptomatic degenerative medial meniscus tear." He reviewed the FCE, placed Mr. Baumgardner in the medium physical demand category, and recommended only occasional squatting and climbing. Dr. Rungee found that Mr. Baumgardner had reached maximum medical improvement (MMI) and said he retained no permanent impairment.

Dr. Rungee testified that his final diagnosis was "left knee strain with asymptomatic degenerative medial meniscus tear." He felt that, because Mr. Baumgardner never had any medial symptoms, the medial meniscus tear must have pre-existed the work accident. He noted that cysts such as the one on Mr. Baumgardner's MRI usually take time to form, which was indicative of a chronic injury rather than an acute one. He also said the McMurray's test, which checks for an unstable meniscus tear, was negative. Dr. Rungee further explained that "most people that have a symptomatic meniscus tear get remarkably better for a period of weeks" with an injection, and Mr. Baumgardner got no relief from his.

In addressing permanent impairment, Dr. Rungee testified there are two methods of assigning impairment pursuant to the Sixth Edition of the American Medical Association's *Guides to the Evaluation of Permanent Impairment* (AMA Guides). One method is a diagnosis-based impairment (DBI) rating. Applying the DBI, the only rating applicable to Mr. Baumgardner would be a Class I rating for the meniscal tear, but Dr. Rungee did not assign that rating because the tear was not related to the work injury. Applying the other range-of-motion (ROM) methodology yielded no permanent impairment either. This was because the lowest category of disability requires range of motion of less than 110 degrees flexion. Because Mr. Baumgardner's flexion never met that threshold, Dr. Rungee felt he was not entitled to any loss of motion impairment.

To counter Dr. Rungee's opinion, Mr. Baumgardner went to Dr. Stephen Neely for an independent medical evaluation (IME) on May 27, 2016. Dr. Neely's report shows he examined Mr. Baumgardner and reviewed his medical records. He noted tenderness at the posteriomedial corner, tenderness over the lateral collateral ligament, and a trace effusion. Other tests were negative and the left knee flexion was 115 degrees. Dr. Neely concluded, "I think this gentleman did sustain injuries to the left knee in this accident in trying to evade a dog during delivery." Per the DBI of the AMA Guides, he assigned a one percent whole-person impairment for the meniscal tear. However, "if we were to use" ROM:

A mild impairment in flexion is noted in the edition as being 80 degrees to 109 degrees and would be 10 percent to the lower extremity. [Mr. Baumgardner] falls just outside of that range in the range of 112 to 114 degrees which still is considerably impaired as opposed to the [right knee.] If we just used a straight mathematical ratio this would give him 8 percent to the involved lower extremity simply in the loss of flexion. . . . I think this amount of flexion is pertinent in that he is unable to squat. He needed to squat to be able to perform his job. This lack of flexion prevented him from returning to his full duty.

In his deposition, Dr. Neely reiterated the findings in his report. When asked whether he had "a diagnosis for Mr. Baumgardner as it relates to his November 2014 injury," he testified, "I do not." However, he did state that the primary finding was lack of flexion, along with a small effusion and pain in the joint lines behind the lateral collateral ligament, and that this finding was consistent with the work injury. His rationale for assigning an impairment rating outside the AMA Guides was, with Mr. Baumgardner's loss of range of motion, "I think there is some impairment inherent in his knee."

On cross-examination, Dr. Neely was asked to confirm that he did not have a diagnosis for Mr. Baumgardner's November 2014 injury. He responded: "I just assume the MRI injury findings were secondary to his injury. That's the way I rated him." Although he felt the pain on the posterior medial joint line was indicative of the medial meniscal tear, he admitted that none of Dr. Rungee's examinations resulted in any findings consistent with an acute medial meniscal tear. He also stated he had no reason to doubt Dr. Rungee's conclusion that the meniscal tear pre-dated the work injury, and he testified that degenerative tears are not uncommon in men of Mr. Baumgardner's age. He agreed that Dr. Rungee's zero percent DBI rating would be correct if the meniscal tear was not work-related.

Dr. Neely also testified at length about his ROM impairment rating. He agreed that the 130 degree of flexion observed by Dr. Rungee on the MMI date constituted a normal range of motion. He also admitted that, under the applicable table in the AMA Guides, none of Mr. Baumgardner's flexion measurements, whether from Dr. Rungee, Dr. Neely, or the FCE, would support any impairment rating. However, because the measurements of 112 degrees from the FCE and the 115 degrees he measured were not normal, he felt it appropriate to compare 115 degrees with a normal rating of 145, a reduction of approximately twenty percent. Based on that difference, he reduced the lowest ROM rating in the AMA Guides (ten percent) by the same percentage, which is how he reached his eight percent rating.

At the Compensation Hearing, Mr. Baumgardner asserted he is entitled to

permanent total disability (PTD) benefits for his leg injury arising primarily out of and in the course and scope of his employment.  In the alternative, he contended he is entitled to permanent partial disability (PPD) benefits.  In support of these contentions, he relied on the opinion of Dr. Neely and denied the validity of Dr. Rungee's opinions for a variety of reasons detailed below.  He also argued that Dr. Rungee's opinion is not entitled to a presumption of correctness.

UPS countered that Mr. Baumgardner is not entitled to PTD benefits because he presented no proof that he is totally disabled from working.  It argued further that Mr. Baumgardner is not entitled to any disability benefits.  It relied on Dr. Rungee's opinion, arguing that, as a panel physician, Dr. Rungee's causation and impairment opinions are presumed to be correct.

## Findings of Fact and Conclusions of Law

The following legal principles govern this case.  Mr. Baumgardner has the burden of proof on all essential elements of his claim.  *Scott v. Integrity Staffing Solutions,* 2015 TN Wrk. Comp. App. Bd. LEXIS 24, at *6 (Aug. 18, 2015).  "[A]t a compensation hearing where the injured employee has arrived at a trial on the merits, the employee must establish by a preponderance of the evidence that he or she is, in fact, entitled to the requested benefits."  *Willis v. All Staff*, 2015 TN Wrk. Comp. App. Bd. LEXIS 42, at *18 (Nov. 9, 2015); *see also* Tenn. Code Ann. § 50-6-239(c)(6) (2016) ("[T]he employee shall bear the burden of proving each and every element of the claim by a preponderance of the evidence.").

*Compensability of the Meniscal Tear*

Mr. Baumgardner's burden includes proving his injury arose primarily out of and in the course and scope of the employment.  Although UPS stipulated to the compensability of the injury, they denied that the medial meniscus tear occurred at that time.  Thus, to meet this part of his burden, Mr. Baumgardner must show his torn medial meniscus injury was "caused by a specific incident, or set of incidents, arising primarily out of and in the course and scope of employment, and is identifiable by time and place of occurrence."  Further, he must show, "to a reasonable degree of medical certainty that it contributed more than fifty percent (50%) in causing the . . . disablement or need for medical treatment, considering all causes."  Tenn. Code Ann. § 50-6-102(14) (2016).

Before considering the medical opinions in this case, the Court must first address the issue of whether Dr. Rungee's opinion is entitled to a statutory presumption of correctness.  Tennessee Code Annotated section 50-6-102(14)(E) establishes a rebuttable presumption of correctness for a causation opinion given by an authorized panel physician.  Mr. Baumgardner admitted selecting Dr. Rungee from a list of doctors but

contended the panel was invalid.  The Court agrees.

Tennessee Code Annotated section 50-6-204(a)(3)(A)(i) provides:

> The injured employee shall accept the medical benefits afforded under this section; provided that in any case when the employee has suffered an injury and expressed a need for medical care, the employer shall designate a group of three (3) or more independent reputable physicians, surgeons, chiropractors or specialty practice groups if available in the injured employee's community or, if not so available, in accordance with subdivision (a)(3)(B),[2] from which the injured employee shall select one (1) to be the treating physician.

Mr. Baumgardner lives in Murfreesboro, Tennessee.  The list of orthopedic specialists provided by UPS included one Murfreesboro doctor, Dr. Rungee.  The other specialists on the list practice in Winchester and McMinnville, which are each approximately fifty miles from Murfreesboro.  These options do not constitute a physician practicing "in the injured employee's community."  Because UPS presented no evidence that an insufficient number of doctors was available in Murfreesboro or its immediate vicinity, the Court holds that the list of physicians was insufficient to entitle Dr. Rungee to the presumption of correctness established in section 50-6-102(14)(E).

In the absence of a presumption favoring one doctor over the other, the Court notes longstanding Tennessee case law, which provides:

> When the medical testimony differs, the trial judge must obviously choose which view to believe.  In doing so, he is allowed, among other things, to consider the qualifications of the experts, the circumstances of their examination, the information available to them, and the evaluation of the importance of that information by other experts.

*Orman v. Williams Sonoma, Inc.*, 803 S.W.2d 672, 676 (Tenn. 1991); s*ee also Darraj v. McKee Foods Corp.,* 2017 TN Wrk. Comp. App. Bd. LEXIS 4, at *13-14 (Jan. 17, 2017).

Applying the first of these factors, the Court notes that both physicians are experienced, board-certified orthopedic surgeons.  A review of their respective curricula vitae shows that each doctor has significant experience upon which to draw in their evaluations.  The Court finds that both doctors are well qualified and the differences in their qualifications are not determinative.

---

[2] Subsection (a)(3)(B) provides an alternate procedure if three or more independent reputable physicians, surgeons, chiropractors or specialty practice groups are not available in the injured employee's community.

Similarly, the other listed factors favor neither doctor. Regarding the circumstances of the evaluation, there is no question that Dr. Neely performed a careful and thorough examination. While Mr. Baumgardner questioned Dr. Rungee's thoroughness, the medical records show he had the opportunity to observe Mr. Baumgardner's knee several times over the course of four months, beginning less than a month after the injury. Further, his office notes document a quantity of tests and carefully relate Mr. Baumgardner's symptoms during that period. As Dr. Neely testified he reviewed Dr. Rungee's records, the information available to the doctors appears to be nearly identical.

The Court must therefore focus on the doctors' reasoning and their explanation of their conclusions. Dr. Rungee consistently stated in his treatment notes that Mr. Baumgardner exhibited no medial pain or other symptoms. He explained, both to Mr. Baumgardner during his treatment and in his report and deposition, that he felt this was evidence that the tear pre-existed the work injury. He noted that the McMurray test was negative and that the injection provided no relief. Dr. Rungee further explained that the cyst shown on the MRI provided additional evidence of a chronic tear, rather than a recent acute event.

In reviewing Dr. Neely's testimony, it is not entirely clear whether he ever actually offered an opinion on the cause of the meniscus tear, much less an opinion that the work injury was the primary cause. Although he said Mr. Baumgardner "did sustain injuries to the left knee in this accident," he did not specify whether those injuries included the meniscal tear. Further, he testified that he did not actually have a diagnosis but just assumed the MRI findings were secondary to the work injury. Notably, Dr. Neely did not dispute Dr. Rungee's conclusion, admitted that he had no reason to doubt it, and acknowledged that none of Dr. Rungee's examinations indicated an acute medial meniscal tear.

Mr. Baumgardner contended that Dr. Rungee's conclusions were unreliable because the doctor ignored his history of no prior left knee injuries. He argued that this constituted a failure to abide by the "Clinical Evaluation" section of the Guides' instructions for preparing reports, found on page twenty-eight of the Guides. Specifically, Mr. Baumgardner insisted Dr. Rungee failed to discuss any medical history inconsistencies with him during the examination, as required by the Guides before preparing his final report. The Court finds this argument unpersuasive.

First, the Guides actually require the doctor to clarify and reconcile any inconsistencies between the "history provided by the patient and the history contained in the medical records." Mr. Baumgardner identified no inconsistencies between the history he gave Dr. Rungee and his medical records that needed to be reconciled. This is unsurprising, since Dr. Rungee, as the treating physician, was the source of most of the

medical records. Instead, Mr. Baumgardner identified the inconsistency as the fact that he had no "history of a pre-existing condition." The mere fact that he had no such history is not inconsistent with the fact that Dr. Rungee appears to have been the first to diagnose the meniscus tear as pre-existing. Further, to the extent Mr. Baumgardner appears to contend that Dr. Rungee ignored or did not believe his history of no prior left-knee injuries, Dr. Rungee's records do not support such an assertion. His first office note and his final report both reflect Mr. Baumgardner's denial of any previous injury. The Court is unable to infer that Dr. Rungee ignored or disbelieved Mr. Baumgardner's history of no prior injury simply because he concluded that the meniscus tear was degenerative.

After careful consideration of the factors set out in *Orman*, as well as the doctors' explanation of their conclusions, the Court finds Dr. Rungee's causation opinion to be more persuasive than that of Dr. Neely. As a result, Mr. Baumgardner has not met his burden of proving by a preponderance of the evidence that his medial meniscus tear arose primarily out of and in the course and scope of his employment with UPS.

*Permanent Disability Benefits*

Mr. Baumgardner seeks PTD benefits. Tennessee Code Annotated section 50-6-207(4)(B) provides: "When an injury not otherwise specifically provided for in this chapter totally incapacitates the employee from working at an occupation that brings the employee an income, the employee shall be considered totally disabled[.]" The assessment of permanent total disability is based upon numerous factors, including the employee's skills and training, education, age, local job opportunities, and the capacity to work at the kinds of employment available in the disabled condition. *Roberson v. Loretto Casket Co.*, 722 S.W.2d 380, 384 (Tenn. 1986); *McIlvain v. Russell Stover Candies, Inc.*, 996 S.W.2d 179, 183 (Tenn. 1999).

Mr. Baumgardner presented no expert vocational proof, although he did testify as to his work history, age, and education. He also indicated his belief that he was unable to work at any job because of Dr. Rungee's permanent restrictions. However, he presented no evidence of local job opportunities and, other than his own opinion, no evidence of his capacity to work at the kinds of employment available in his disabled condition. Further, the only disabling condition identified by Mr. Baumgardner was his left knee. Although UPS had no work for him within his restrictions, the evidence presented is insufficient for the Court to conclude Mr. Baumgardner is incapable of working at any occupation that would bring him an income.

In the alternative to a finding of total disability, Mr. Baumgardner seeks PPD benefits. PPD benefits are owed when an employee sustains a permanent impairment from a work injury but is still able to work. *See* Tenn. Code Ann. § 506-207(3)(A) (2017).

There are several medical impairment ratings to consider – Dr. Rungee's zero percent ratings and Dr. Neely's ratings of one percent under the DBI method and eight percent under the ROM method. Starting with Dr. Neely's DBI rating, the Court notes that he based this solely on the diagnosis of Mr. Baumgardner's medial meniscus tear. As the Court has already found that Mr. Baumgardner has not proven the compensability of this tear, the accompanying DBI rating is inapplicable to any determination of PPD.

Regarding Dr. Neely's ROM rating, the Court notes the Guides state on page 497 that DBI is the primary method for evaluation of leg injuries and that ROM should only be used "to determine actual impairment values when it is not possible to otherwise define impairment." Dr. Neely did not provide an explanation to show why it was not possible to define impairment in Mr. Baumgardner's case. Rather, it appears he simply used ROM because he felt Mr. Baumgardner's condition merited more impairment than that provided under the DBI method. The Court finds the evidence presented on this issue to be insufficient to justify an award of PPD benefits based on Mr. Baumgardner's range-of-motion.

Even if a ROM evaluation were merited in this case, both Dr. Rungee and Dr. Neely agreed that Mr. Baumgardner did not qualify for any permanent impairment under the ROM section of AMA Guides. Dr. Neely, however, felt that some degree of impairment was appropriate because Mr. Baumgardner's range-of-motion was not normal, even if it did not meet the Guides' threshold.

The Court is sympathetic to Dr. Neely's concerns, but Tennessee Code Annotated section 50-6-204(d)(B) provides that: "No anatomical impairment or impairment rating . . . shall be . . . admissible into evidence at the trial of a workers' compensation matter unless the impairment is based on the applicable edition of the AMA Guides or, in cases not covered by the AMA Guides, an impairment rating by any appropriate method used and accepted by the medical community." Thus, the only exception provided by the statute is a case "not covered by the AMA Guides," and Mr. Baumgardner's case, a knee injury, *is* covered by the AMA Guides. Further, even if Mr. Baumgardner's leg injury were not covered, he presented no evidence that Dr. Neely's approach was an "appropriate method used and accepted by the medical community." For these reasons, the Court cannot accept Dr. Neely's rating.

Mr. Baumgardner pointed out that, regardless of any permanent impairment rating, he has significant permanent restrictions as a result of his work accident that have severely limited his employment opportunities. He argued that impairment is only one element of vocational disability and an employee with no rating but narrow restrictions may still qualify for PPD benefits. The Court recognizes the apparent conflict between a zero rating and permanent lifting restrictions, as well as the likelihood of vocational

disability caused by those restrictions, but finds no statutory authority for awarding (or a method for calculating) PPD benefits without a medical impairment rating. The cases cited by Mr. Baumgardner were decisions under prior law, which was fundamentally different from the current statute that provides partial disability "*shall* be determined by multiplying the employee's impairment rating by four hundred fifty (450) weeks." (Emphasis added.)

Based on the foregoing, and in the absence of any credible medical impairment rating, the Court cannot find Mr. Baumgardner has met his burden of establishing entitlement to PPD benefits.

*Medical Benefits*

Under the Workers' Compensation Law, "the employer or the employer's agent shall furnish, free of charge to the employee, such medical and surgical treatment . . . made reasonably necessary by accident[.]" Tenn. Code Ann. § 50-6-204(a)(1)(A). Employers are also required to offer a panel of physicians "from which the injured employee shall select one (1) to be the treating physician." Tenn. Code Ann. § 50-6-204(a)(3)(A)(i). As noted above, the panel from which Mr. Baumgardner selected Dr. Rungee was technically invalid. As a result, Mr. Baumgardner contends he is entitled to a new panel. UPS acknowledges Mr. Baumgardner's right to continuing medical treatment but insists this should be provided by Dr. Rungee.

Mr. Baumgardner's request raises the following question – is an employee entitled to a new panel when an employer's panel is flawed, but the employee acquiesced to treatment with the selected physician? Mr. Baumgardner provided no case authority addressing this exact issue, and the Court has identified none. In the absence of any controlling authority, the Court must look to the statute itself. In *Petty v. Convention Production Rigging, Inc.*, 2016 TN Wrk. Comp. App. Bd. LEXIS 95, at *20 (Dec. 29, 2016), the Appeals Board wrote:

> [o]ur role in construing a statute is to ascertain and give effect to the legislative intent without unduly restricting or expanding a statute's coverage beyond its intended scope. To do so, we focus initially on the statute's words, giving these words their natural and ordinary meaning in light of their statutory context. We must avoid any forced or subtle construction that would limit or extend the meaning of the language. Every word in a statute is presumed to have meaning and purpose, and the statute must be construed in its entirety.

Applying this approach, the Court notes that section 50-6-204(a)(3)(A)(i) requires that an employer "*shall* designate a group of three (3) or more independent reputable

physicians . . . if available in the injured employee's community." Because UPS failed to do this, the Court is compelled to order it to comply with the statute and provide a valid panel of orthopedic specialists. The Court has reservations about the necessity of a new panel in a case where Mr. Baumgardner acquiesced to treatment for several months, made no request to return to his authorized doctor for two years, made no objection to his treatment or requested another doctor during that time, or sought treatment on his own with another physician. However, the Court declines to infer a time limitation on UPS' statutory duty to provide a panel, as such a construction of the statute is the province of the appellate courts.

**IT IS, THEREFORE, ORDERED** as follows:

1. UPS shall continue to provide Mr. Baumgardner with medical treatment made reasonably necessary by the November 11, 2014 injury and in accordance with Tennessee Code Annotated section 50-6-204 (2016), to be initiated by providing Mr. Baumgardner with a panel of orthopedic specialists.

2. Mr. Baumgardner's claim against UPS and its workers' compensation carrier for the requested permanent disability benefits is denied.

3. Costs of this cause of $150.00 are assessed against UPS pursuant to Tennessee Compilation Rules and Regulations 0800-02-21-.07, to be paid within five days of this Order becoming final.

4. UPS shall prepare and file a statistical data form within ten business days of the date of this Order, pursuant to Tennessee Code Annotated section 50-6-244.

5. After a Compensation Hearing Order entered by a Workers' Compensation Judge becomes final in accordance with Tennessee Code Annotated section 50-6-239(c)(7), compliance with this Order must occur in accordance with Tennessee Code Annotated section 50-6-239(c)(9). The Insurer or Self-Insured Employer must submit confirmation of compliance with this Order to the Bureau by email to WCCompliance.Program@tn.gov no later than the fifth business day after this Order becomes final or all appeals are exhausted. Failure to submit the necessary confirmation within the period of compliance may result in a penalty assessment for non-compliance.

**ENTERED this the 28th day of June, 2017.**

_____
**Dale Tipps**
**Workers' Compensation Judge**

11

## APPENDIX

Exhibits:

1. Transcript of Dr. James Rungee's deposition
2. Transcript of Dr. Stephen Neely's deposition
3. Indexed medical records submitted by Mr. Baumgardner
4. Indexed medical records submitted by UPS
5. Joint indexed exhibits
6. Form C-42 Choice of Physician form

Technical Record:

1. Petition for Benefit Determination
2. Post-Discovery Dispute Certification Notice
3. Parties' Exhibit and Witness Lists
4. Pre-Compensation Hearing Statements
5. Parties' Pre-Hearing Briefs

The Court did not consider attachments to Technical Record filings unless admitted into evidence during the Compensation Hearing. The Court considered factual statements in these filings or any attachments to them as allegations unless established by the evidence.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the Compensation Hearing Order was sent to the following recipients by the following methods of service on this the 28th day of June, 2017.

| Name | Certified Mail | Via Fax | Via Email | Service sent to: |
|------|----------------|---------|-----------|------------------|
| Jason Denton, Employee's Attorney | | | X | jdenton@rma-law.com |
| David Hooper Employer's Attorney | | | X | dhooper@hooperzinn.com |

_____
**PENNY SHRUM, COURT CLERK**
wc.courtclerk@tn.gov

12