**FILED**
**Jul 06, 2023**
**02:55 PM(ET)**
TENNESSEE COURT OF
WORKERS' COMPENSATION
CLAIMS



# TENNESSEE BUREAU OF WORKERS' COMPENSATION
## IN THE COURT OF WORKERS' COMPENSATION CLAIMS
## AT CHATTANOOGA

| | | |
|---|---|---|
| **Sheila Owens,** | ) | **Docket No. 2017-01-0401** |
| **Employee,** | ) | |
| **v.** | ) | |
| **Sitters, Etc.,** | ) | **State File No. 44323-2015** |
| **Employer,** | ) | |
| **And** | ) | |
| **Bridgefield Casualty Ins. Co.,** | ) | **Judge Audrey A. Headrick** |
| **Insurance Carrier.** | ) | |

## COMPENSATION ORDER

Ms. Owens claimed permanent and total disability from a June 9, 2015 accident that injured her neck, left shoulder and low back. Sitters claimed she was only partially disabled from the shoulder and low back. It disputed the neck injury based on lack of timely notice and compensability, denying the obligation to pay medical and temporary disability benefits for the neck. For the reasons below, the Court holds Ms. Owens is permanently and totally disabled and awards additional temporary disability benefits and medical benefits for the neck injury.

### History of Claim

On June 9, 2015, Ms. Owens injured her neck, left shoulder, and low back while working as a nursing assistant for Sitters. Sitters accepted the back and shoulder injuries as compensable and agreed Ms. Owens gave timely notice of those injuries. However, it disputed timely notice and the compensability of the alleged neck injury.

Ms. Owens treated with orthopedic surgeons Dr. Rickey Hutcheson for her back and Dr. Robert Mastey for her shoulder.

Dr. Hutcheson placed Ms. Owens at maximum medical improvement on January 26, 2016, assessed a one-percent impairment rating, and released her to work in the light-duty category based on a functional capacity evaluation.

1

Dr. Hutcheson assigned a dozen restrictions, including: (1) maximum occasional lifting below waist height of fifteen pounds; (2) maximum lifting to shoulder height of twenty pounds; (3) maximum carrying of twenty-five pounds; (4) maximum pushing of forty-eight pounds; (5) maximum pulling of fifty-six pounds; (6) frequent sitting, standing, and walking; (7) occasional bending for less than twenty-three percent of the time; (8) occasional squatting and kneeling; (9) no continuous walking; (10) no frequent reaching overhead; (11) no continuous hand tasks; and (12) occasional climbing stairs and ladders.

Dr. Mastey placed Ms. Owens at maximum medical improvement on December 7, 2016, assessed a three-percent impairment rating, and released her without restrictions.

While seeing Dr. Mastey, Ms. Owens also sought unauthorized treatment with Dr. Richard Pearce, a board-certified orthopedic surgeon, for her neck pain with bilateral extremity numbness and tingling. Before this injury and seeing Dr. Pearce, Ms. Owens underwent three neck surgeries at levels below C3-4 due to a previous work injury.

Ms. Owens reported to Dr. Pearce that her symptoms worsened after the June 2015 injury. Diagnostic testing showed a disc herniation at C3-4 with significant cord compression and cervical stenosis, which Dr. Pearce described as "a definite anatomic change" compared to older testing. Dr. Pearce recommended surgery at C3-4 and expressed concern about the development of permanent neurological problems if she did not have surgery.

Dr. Pearce testified by deposition twice. At his January 12, 2018 deposition he testified that "her condition at C3-4 was *proximately* caused by her [June 9, 2015 injury]." He also assigned work restrictions of no "manual-type work," including no use of ladders or high-risk fall situations.

In Dr. Mastey's deposition, he declined to offer a causation opinion on Ms. Owens's alleged neck injury and repeatedly deferred to Dr. Pearce on that issue. However, Dr. Mastey stated that Ms. Owens initially believed her problems stemmed primarily from her left-shoulder injury at Sitters. Dr. Mastey testified about the "great interplay between [the neck and shoulder]." He explained that most of Ms. Owens's pain came from her neck down into her shoulder.

Sitters sent Ms. Owens to Dr. Jay Jolley, a board-certified orthopedic surgeon, for an employer's examination regarding her alleged neck injury. Dr. Jolley, a fourteen-year practitioner, did not review all her diagnostic tests. He testified her "overwhelming degeneration and arthritis at [C3-4] [caused] her significant pain and [was] more responsible [for the recommended surgery] than the [June 2015] incident." Dr. Jolley did not think her C3-4 condition was work-related but acknowledged "there could've been some aggravation of the pre-existing degeneration." Further, he agreed with Dr. Pearce that the need for surgery was caused by the aggravation of the preexisting condition.

2

The Court ordered Sitters to offer Ms. Owens a panel of orthopedists after an expedited hearing, and Sitters appealed. During the appeal, Dr. Pearce surgically placed hardware in Ms. Owens's neck in April 2019. Two months later, the Appeals Board affirmed. Sitters then offered Ms. Owens a panel of orthopedists, from which she selected Dr. Alex Sielatycki, a two-year practitioner at the time.

In March 2020, Dr. Sielatycki's only office note reflected he saw Ms. Owens for "a 2nd opinion" to answer causation questions. Ms. Owens expressed improvement since her April 2019 surgery but still complained of neck pain, bilateral upper extremity pain, and bilateral hand pain and numbness.

During his deposition, Dr. Sielatycki responded inconsistently to causation questions and acknowledged he did not review all of Ms. Owens's diagnostic tests. Initially, he said he could not causally relate the worsening at C3-4 to the June 2015 injury. Dr. Sielatycki then testified that the appearance of a soft-disc herniation suggested a recent onset from an acute event or trauma at C3-4, implying that trauma caused an aggravation of her preexisting condition. However, he ultimately related Ms. Owens's ongoing complaints to her neck surgeries from the older work injury. Based on his unrebutted opinion, the Court released Sitters from its obligation to treat Ms. Owens's neck.

Recently, Dr. Pearce, a thirty-year practitioner, testified again by deposition regarding Ms. Owens's neck. He stated that the June 2015 injury was the primary cause of her symptoms and need for surgery. Dr. Pearce reiterated the severe spinal cord compression and changes created urgency to perform the April 2019 surgery at C3-4, which he described as unrelated to her past surgeries involving levels below C3-4. After surgery, he noted Ms. Owens still experienced spinal cord related symptoms, such as bilateral upper extremity numbness and loss of dexterity.

Dr. Pearce also testified regarding Ms. Owens's impairment rating and permanent restrictions. He placed her at maximum medical improvement on July 2, 2020. Later, Dr. Pearce assessed a twelve-percent impairment rating. During his deposition, Dr. Pearce revised his impairment rating to thirteen percent, since Ms. Owens's post-surgical symptoms included spinal cord symptoms instead of radicular symptoms. Dr. Pearce also assigned permanent work restrictions of sedentary work, including avoiding jobs requiring "a lot of dexterity . . . heights, ladders, things like that."

At trial, Ms. Owens, fifty-eight years old and born September 25, 1964, described her education. She received a high school diploma. However, Ms. Owens, who is dyslexic, started taking special education classes beginning in fourth grade.[1] Ms. Owens explained she has difficulty with reading and writing but can do so slowly.

---

[1] Despite taking special education classes, Ms. Owens introduced a fifth-grade report card showing she received Ds and Fs in reading, oral and written language, spelling, math, and social studies.

Ms. Owens described her work history. She started working at age fourteen performing cleanup work. Next, Ms. Owens worked at a hospital delivering food trays to patients and cleaning the trays. She also worked at a local plant performing physical work, which is where she first injured her neck. After that work injury, Ms. Owens returned to work at the plant. Since 2010, Ms. Owens worked as an in-home sitter.

Ms. Owens testified about her sitter work. Ms. Owens's job required her to perform personal care of patients, including bathing, feeding, dressing, and lifting. For bedridden patients, she used a sheet to turn them. For patients who walked, Ms. Owens either held on to them by their arm or supported them with a band to prevent falls.

Ms. Owens has not worked or applied for a job since her June 2015 injury. However, she wants to work as an in-home sitter again if she could do so within her restrictions. Ms. Owens has not applied for any jobs because sitter work requires the sitter to stay awake while with the patient. She stated that the medications she takes three times a day make her sleepy constantly. Ms. Owens did not take her medication the morning of trial to avoid falling asleep. She acknowledged she was in pain management for her older work injury; however, after her June 2015 injury at Sitters, she takes more medication, including Gabapentin, at a higher strength.

Ms. Owens and four corroborating witnesses testified about the change in her activity level after the June 2015 injury. Previously, Ms. Owens performed strenuous tasks such as mowing, gardening, painting, cleaning, driving, exercising, and cooking. Afterward, Ms. Owens either stopped performing those activities or performed them on a limited basis with frequent breaks. Other changes included Ms. Owens's inability to stay awake for more than two to three hours or keep her grandchildren, and frequently dropping items. Ms. Owens described having neck tightness and limited ability to turn her neck, right shoulder and arm pain, and bilateral hand numbness.

Both Ms. Owens and Sitters relied on experts regarding the extent of her vocational disability. Ms. Owens offered John McKinney, a certified rehabilitation counselor and vocational expert. Sitters relied on Michelle McBroom Weiss, a certified rehabilitation and vocational expert. Both experts have performed vocational evaluations since 1992.

Both experts found that Ms. Owens gave a reliable effort her testing. They both found that Ms. Owens scored in the extremely low to low average range of academic achievement. Her scoring placed her at less than a fifth-grade level in all categories. They both concluded that Ms. Owens had limited intellectual capacity: Mr. McKinney assessed her as having below-average intellectual function (scoring an eighty-seven) of intellectual functioning, while Ms. Weiss found her to have borderline learning ability (scoring seventy-one). They agreed that Ms. Owens's work experience fell into the semi-skilled category, while Mr. McKinney also placed her in the unskilled category. They also agreed

4

that Ms. Owens's restrictions prevented her from returning to her job at Sitters. However, the experts differed regarding the extent of Ms. Owens's vocational disability.

Mr. McKinney believed Ms. Owens to be totally vocationally disabled. In support, he stated that her sedentary work restrictions virtually eliminated all jobs because her past employment required medium to heavy occupational demands. Mr. McKinney also concluded that Ms. Owens was not a viable candidate for vocational retraining because of her age, academic testing below the fifth-grade level, work history including her lack of employment for the past eight years, and use of narcotic medications. Mr. McKinney explained there must be a reasonable expectation of returning to work to qualify for retraining. Finally, he reasoned that Ms. Owens's lack of access to the job market would be more than ninety-five percent based on his experience.

Ms. Weiss assessed Ms. Owens's vocational capacity in view of the restrictions of Drs. Hutcheson and Pearce separately. Relying solely on Dr. Hutcheson's restrictions, Ms. Weiss concluded that Ms. Owens sustained a forty-four percent vocational disability. Relying solely on Dr. Pearce's restrictions, she sustained either a sixty-four percent vocational disability or a one hundred percent vocational disability depending on the interpretation of one particular restriction. Ms. Weiss explained that Dr. Pearce did not define whether his dexterity restriction limited Ms. Owens to "frequent" hand use, causing a sixty-four percent vocational disability or "occasional" hand use, causing her to be totally disabled. She did not factor into her analysis Ms. Owens's age, lack of employment for the past eight years, or her use of narcotic medications. However, Ms. Weiss agreed that Ms. Owens can no longer work as a CNA.[2]

Ms. Weiss also considered a job survey she performed in the Chattanooga area in arriving at her opinions. She contacted fifty-four employers with posted job openings for sitter/companion positions, but only nine responded. Out of the nine, all the employers stated the posted job met Dr. Hutcheson's restrictions. However, five employers could not accommodate Dr. Pearce's restrictions. The remaining four employers stated that they had sitter/companion positions, though none were posted, that satisfied Dr. Pearce's restrictions.

Regarding past benefits paid, Ms. Owens received temporary disability benefits totaling $3,012.23 from June 9 to October 19, 2015. Ms. Owens earned $210.55 weekly, resulting in a weekly compensation rate of $140.37. Sitters agreed she did not return to work making the same or greater pay as she earned before the June 2015 injury.

**Findings of Fact and Conclusions of Law**

---

[2] Ms. Weiss also assessed her based on a restriction purportedly assigned by a doctor who treated her older work injury, which the Court did not consider.

At a Compensation Hearing, Ms. Owens must prove by a preponderance of the evidence that she is entitled to benefits. Tenn. Code Ann. § 50-6-239(c)(6) (2022). The parties agreed Ms. Owens suffered compensable low back and left shoulder injuries resulting in permanent impairment and the right to future treatment for her injuries. For that reason, the Court need only address the disputed neck claim and whether Ms. Owens is permanently and totally disabled.

The Court first considers the notice issue raised by Sitters. As noted earlier, Sitters accepted Ms. Owens's back and shoulder injuries as compensable. It only disputed notice regarding her neck injury and cited *Ernstes v. Printpack, Inc.,* 2023 TN Wrk. Comp. App. Bd. LEXIS 25, at *34-36 (June 6, 2023). Sitters's reliance on *Ernstes* is misplaced. *Ernstes* listed factors to consider when an employee fails to give written or actual notice of a work-accident or injury.

Sitters agreed Ms. Owens timely notified it of her back and shoulder injuries but disputed notice of her neck injury. No requirement exists that an employee must give notice of several injuries sustained in a work-accident. *Quaker Oats Co. v. Smith*, 574 S.W.2d 45, 48 (Tenn. 1978). The notice requirement is satisfied when an employee notifies the employer of an accident that resulted in injury. *Id.* Therefore, the Court holds Ms. Owens gave timely notice of her neck injury.

Next, the Court considers the compensability of Ms. Owens's neck injury. She must show, to a reasonable degree of medical certainty, that the June 2015 incident "contributed more than fifty percent (50%) in causing [her] . . . disablement or need for medical treatment, considering all causes." Tenn. Code Ann. § 50-6-102(12)(B). Likewise, to prove a compensable aggravation of a preexisting condition, Ms. Owens must show that the aggravation arose primarily out of and in the course and scope of employment, to a reasonable degree of medical certainty. Tenn. Code Ann. § 50-6-102(12)(A).

Sitters relies upon Dr. Sielatycki, whom Ms. Owens selected from a panel. However, he never acted as a treating physician and instead documented her one-time visit as a second opinion limited to addressing causation. Therefore, the Court holds Dr. Sielatycki's opinion is not entitled to a presumption of correctness. Tenn. Code Ann. § 50-6-102(12)(E).

To determine causation, the Court considers the expert opinions of Drs. Sielatycki, Jolley, and Pearce. Dr. Sielatycki gave contradictory causation opinions. Dr. Jolley did not think Ms. Owens's C3-4 condition was work-related but acknowledged the possibility of an aggravation of preexisting degeneration. He agreed with Dr. Pearce that the need for surgery was caused by the aggravation of the preexisting condition. Dr. Pearce stated the June 2015 injury was the primary cause of her symptoms and need for surgery.

In evaluating conflicting expert testimony, a trial court may consider, among other

6

things, "the qualifications of the experts, the circumstances of their examination, the information available to them, and the evaluation of the importance of that information through other experts." *Brees v. Escape Day Spa & Salon,* 2015 TN Wrk. Comp. App. Bd. LEXIS 5, at *14 (Mar. 12, 2015).

After considering these factors, the Court finds the causation opinion of Dr. Pearce more persuasive than the opinions of Drs. Sielatycki and Jolley.[3] Dr. Pearce, board-certified with thirty years of experience, treated Ms. Owens since 2016, reviewed all her records, and performed her surgery.

Dr. Sielatycki, who is not board-certified and had only two years of experience, provided a one-time evaluation without the benefit of all her records. Likewise, Dr. Jolley, a board-certified, fourteen-year practitioner, also gave a one-time evaluation without the benefit of all her records. Tennessee law considers it reasonable to conclude that the physician having greater contact with an injured worker has an advantage in providing a more in-depth, if not more accurate opinion. *Bass v. Home Depot U.S.A., Inc.,* 2017 TN Wrk. Comp. App. Bd. LEXIS 36, at *14 (May 26, 2017). Therefore, the Court accepts Dr. Pearce's causation opinion and holds that Ms. Owens sustained a compensable neck injury.

The Workers' Compensation Law requires an employer to furnish reasonable, necessary treatment at no cost to the injured worker. Tenn. Code Ann. § 50-6-204. Whether an employee is justified in seeking payment for unauthorized medical expenses from an employer depends upon the circumstances of each case. *Buchanan v. Mission Ins. Co.,* 713 S.W.2d 654, 656 (Tenn. 1986). Further, "an employer who elects to deny a claim for workers' compensation benefits bears the risk of being held responsible for medical expenses incurred by the employee in the event the court later determines that such benefits were owed." *Barrett v. Lithko Contracting, Inc.,* 2016 TN Wrk. Comp. App. Bd. LEXIS 93, at *8 (Dec. 8, 2016).

Sitters chose to send Ms. Owens for an employer's examination with Dr. Jolley instead of offering her a panel of neck specialists. Based on Dr. Jolley's opinion, it denied her neck claim. When the Court ordered it to authorize treatment, including surgery, for her neck injury, Sitters appealed. By making those decisions, Sitters accepted the risk of being held responsible for medical expenses incurred by Ms. Owens for her treatment of work- related injuries.

Here, Dr. Pearce testified about his concern regarding the development of permanent neurological problems if Ms. Owens did not have the C3-4 surgery caused by the June 2015 injury. Even Dr. Jolley agreed that the need for the surgery was caused by the aggravation of a preexisting condition. The Court holds that the medical treatment, for

---

[3] The Court's opinion remains the same even if viewing Dr. Sielatycki as a physician entitled to the presumption of correctness.

which Ms. Owens submitted records, was reasonable and necessary, and Ms. Owens was justified in seeking treatment, including surgery, for her neck injury.

Dr. Pearce testified that the expenses incurred by Ms. Owens, for which Ms. Owens submitted the billing records, were medically necessary for treatment of her neck injury. Based on this evidence, the Court holds Sitters must pay for Dr. Pearce's treatment, including his surgery-related charges, under the fee schedule and reimburse the health insurer. *See Russell v. Genesco, Inc.*, 651 S.W.2d 206, 211 (Tenn. 1983). Further, Sitters shall furnish future medical benefits for ongoing treatment by Dr. Pearce.

Next, Ms. Owens seeks additional temporary partial disability benefits from January 12, 2018, to July 2, 2020. She must prove she earned less than her average weekly wage due to work restrictions but had not yet reached maximum recovery. Tenn. Code Ann. § 50-6-207(2)(A). Sitters argued that Ms. Owens reached maximum medical improvement for her injuries on December 7, 2016. However, Dr. Pearce assigned work restrictions for her neck injury beginning January 12, 2018, and he placed her at maximum medical improvement on July 2, 2020.

Relying on Dr. Pearce's uncontroverted testimony, the Court holds Ms. Owens reached maximum medical improvement on July 2, 2020. Sitters agreed Ms. Owens did not return to work. The Court holds Sitters must pay Ms. Owens temporary partial disability benefits from January 12, 2018, to July 2, 2020 (129 weeks), which equates to $18,107.73 at the agreed weekly compensation rate of $140.37.

The Court now turns to Ms. Owens's request for permanent total disability benefits. Tennessee law states that, "[w]hen an injury not otherwise specifically provided for in this chapter totally incapacitates the employee from working at an occupation that brings the employee an income, the employee shall be considered totally disabled[.]" Tenn. Code Ann. § 50-6-207(4)(B).

The assessment of permanent total disability is based on numerous factors, including the employee's skills and training, education, age, local job opportunities, and the capacity to work at the kinds of employment available in the disabled condition. *Roberson v. Loretto Casket Co.*, 722 S.W.2d 380, 384 (Tenn. 1986); *see also Duignan v. Stowers Mach. Corp.*, No. E2018-01120-SC-R3-WC, 2019 Tenn. LEXIS 224, at \*21 (Tenn. Workers' Comp. Panel June 19, 2019). Although a medical expert's rating of anatomical disability is one of the relevant factors, "the vocational disability is not restricted to the precise estimate of anatomical disability made by a medical witness." *Henson v. City of Lawrenceburg*, 851 S.W.2d 809, 812 (Tenn. 1993). In addition, the employee's "own assessment of [her] physical condition and resulting disability is competent testimony that should be considered[.]" *McIlvain v. Russell Stover Candies, Inc.*, 996 S.W.2d 179, 183 (Tenn. 1999); *see also Duignan*, at \*21-22.

Both parties offered experts to testify as to the extent of Ms. Owens's vocational disability. With conflicting expert opinions, the Court again considers "the qualifications of the experts, the circumstances of their examination, the information available to them, and the evaluation of the importance of that information through other experts." *Brees, supra*.

Here, the Court finds that Mr. McKinney and Ms. Weiss are well-qualified to provide an expert opinion, and one does not hold a clear advantage over the other. Their testimony was similar in many ways. They both found Ms. Owens put forth a reliable effort in her testing and that her academic testing was in the low to low-average range. Specifically, she scored at less than a fifth-grade level. Both experts found Ms. Owens intellectual testing placed her in the below-average to borderline learning ability. They considered her past work to be in the unskilled to semi-skilled category. Further, both agreed Ms. Owens's restrictions prevent her from returning to her job at Sitters or any CNA position.[4]

The most significant difference in the expert opinions is their interpretation of the jobs available to Ms. Owens. Mr. McKinney considered restrictions from Drs. Hutcheson and Pearce, concluding Ms. Owens's lack of access to the job market to be more than ninety-five percent. He found Ms. Owens one hundred percent vocationally disabled.

On the other hand, Ms. Weiss considered Drs. Hutcheson and Pearce's restrictions separately. Ms. Weiss assessed a forty-four percent vocational disability when considering only Dr. Hutcheson's restrictions. She considered Ms. Owens to have a sixty-four percent vocational disability if Dr. Pearce's dexterity restriction prohibited "frequent hand use." Ms. Weiss also found Ms. Owens one hundred percent vocationally disabled if Dr. Pearce's dexterity restriction limited her to "occasional hand use."

In addition to expert opinion, the "employee's own assessment of his or her overall physical condition, including the ability or inability to return to gainful employment, is competent testimony that must be considered" when determining vocational disability. *Hubble v. Dyer Nursing Home,* 188 S.W.3d 525, 535-36 (Tenn. 2006). The Court had the opportunity to directly observe Ms. Owens and found her testimony forthcoming, honest, and self-assured. *Kelly v. Kelly*, 445 S.W.3d 685, 695-696 (Tenn. 2014). Her explanation was reasonable regarding why she is physically unable to work due to her injuries. The Court also found Ms. Owens believable in her desire to return to work if she physically could do so. Likewise, the corroborating testimony of Ms. Owens's witnesses supported her inability to work. The Court finds her testimony credible.

---

[4] Ms. Weiss testified four employers offer sitter/companion positions within Dr. Pearce's restrictions. The physical requirements for sitter/companion positions sometimes differ from CNA requirements.

The Court finds Ms. Owens's age and learning disability would adversely affect her employment search. She is now fifty-eight years old and has been out of the workforce for eight years. Ms. Owens's dyslexia and testing at less than a fifth-grade level would inhibit her ability to apply for jobs or to learn new workplace skills.

The local job market is also not favorable to Ms. Owens, as the proof showed very few, if any, jobs available in her disabled condition. Four out of nine employers who responded to Ms. Weiss's survey stated they had sitter/companion positions that would satisfy Dr. Pearce's restrictions. However, the companies did not post those positions. Further, it is not clear that they would hire Ms. Owens given her age, lack of work for eight years, and learning disability.

Finally, the Court construes Dr. Pearce's restriction for Ms. Owens to "avoid" jobs requiring "a lot of dexterity" to mean at a minimum "occasional" hand use. If Dr. Pearce restricted Ms. Owens to occasional hand use, Ms. Weiss agreed it made Ms. Owens one hundred percent vocationally disabled.

The Court holds the preponderance of the evidence shows Ms. Owens is permanently and totally disabled. She is entitled to weekly benefits from July 3, 2020, the day after maximum medical improvement, "until [she] is, by age, eligible for full benefits in the Old Age Insurance Benefit Program under the Social Security Act." *See* Tenn. Code Ann. § 50-6-207(4)(A)(i).

**IT IS, THEREFORE, ORDERED** as follows:

1. Sitters shall furnish medical care for Ms. Owens's injuries as required by Tennessee Code Annotated section 50-6-204. Dr. Pearce is designated as the authorized treating doctor for her neck injury. Drs. Hutcheson and Mastey remain authorized treating doctors for her low back and left shoulder injuries.

2. Upon presentation of the bills by Ms. Owens or Dr. Pearce, Sitters shall timely pay the charges for past treatment of her work-related neck injury under the fee schedule.

3. Payment of past due temporary disability benefits in the amount of $18,107.73 shall be made for the period from January 12, 2018, to July 2, 2020. Her attorney is entitled to twenty percent of this sum.

4. Ms. Owens will be eligible for full benefits in the Old Age Insurance Benefit Program on September 25, 2031. The period from July 3, 2020, to September 25, 2031, is 586 weeks, totaling $82,256.82. Sitters shall pay the accrued benefits from July 13, 2020, through July 6, 2023, or 157 weeks, in a lump sum of $22,038.09 at the compensation rate of $140.37. It shall also pay 90 weeks

10

of commuted benefits under section 50-6-207(4)(A)(ii)(a) in a lump sum of $12,633.30 to pay attorney's fees. Reducing the total benefits by the accrued and commuted amounts leaves a balance of $47,585.43. To distribute that balance over the remaining 429-week period of total disability, the Court recalculates an adjusted weekly compensation rate of $110.92. Tenn. Code Ann. § 50-6-207(4)(A)(ii)(c). Sitters shall pay Ms. Owens at the adjusted weekly rate of $110.92 through September 25, 2031.

5. Sitters shall pay costs of $150.00 to the Court Clerk within five business days.

6. Sitters shall file form SD-2 with the Clerk within ten business days of this order becoming final.

7. Unless appealed, this order becomes final in thirty days.

**ENTERED July 6, 2023.**

_Audrey Headrick_

**Judge Audrey A. Headrick**
**Court of Workers' Compensation Claims**

11

**APPENDIX**

Exhibits:

1. Joint Pre-Compensation Hearing Statement
2. Vocational report of Mr. McKinney
3. Deposition of Dr. Pearce, January 12, 2018
4. Deposition of Dr Pearce, March 3, 2023
5. Vocational report of Ms. Weiss
6. Deposition of Dr. Jolley
7. Deposition of Dr. Hutcheson
8. Deposition of Dr. Mastey
9. Deposition of Dr. Sielatycki
10. Medical records
11. Medical records of Dr. Pearce
12. Fifth grade report card
13. Correspondence from Ms. Owens's attorney's office to opposing counsel (Identification only)

Technical Record:

1. Petition for Benefit Determination
2. Dispute Certification Notice
3. Motion for Medical Treatment
4. Motion to Quash Notice of Deposition of Sheila D. Owens
5. Defendant's Response to Plaintiff's Motion to Quash Notice of Deposition of Sheila Owens
6. Defendant's Response to Plaintiff's Motion for Medical Treatment
7. Order Denying Motion to Quash Notice of Deposition
8. Show Cause Order
9. Request for Expedited Hearing
10. Employer's Response to Show Cause Order
11. Employee's Reply to Employer's Response to Show Cause Order
12. Order on Show Cause Hearing
13. Employer's Motion for Attorney Fees
14. Employer's Motion for Extension of Time
15. Order Granting Employer's Motion for Extension of Time
16. Order Denying Employer's Motion for Attorney Fees
17. Employer's Response to Employee's Request for Expedited Hearing
18. Docketing Notice for On-the-Record Determination
19. Employee's Reply to Employer's Response to Employee's Request for Expedited

Hearing

20. Expedited Hearing Order
21. Expedited Hearing Notice of Appeal
22. Workers' Compensation Appeals Board Opinion
23. Motion to Correct the Record
24. Employer's Response to Employee's Motion to Correct the Record
25. Amended Motion to Correct the Record
26. Notice of Appeal, Tennessee Supreme Court
27. Employer's Response to Employee's Amended Motion to Correct the Record
28. Brief in Support of Amended Motion to Correct the Record
29. Motion to Dismiss Employee's Appeal, Tennessee Supreme Court
30. Order Granting Amended Motion to Correct the Record
31. Order, Tennessee Supreme Court
32. Scheduling Order, July 23, 2018
33. New Fact Witnesses
34. Amended List of New Fact Witnesses
35. Petition for Benefit Determination, October 30, 2018
36. Witness and Exhibit List
37. Employer's Pre-Hearing Brief
38. Employee's Pre-Hearing Brief
39. Witness and Exhibit List
40. Pre-Compensation Hearing Statement
41. Amended Witness and Exhibit List
42. Dispute Certification Notice, November 7, 2018
43. Order Continuing Compensation Hearing and Setting Case for Status Hearing
44. Order Setting Case for Expedited Hearing
45. Request for Expedited Hearing
46. Employer's Brief in Response to Employee's Request for Expedited Hearing
47. Employee's Supplemental Pre-Hearing Brief
48. Expedited Hearing Order
49. Expedited Hearing Notice of Appeal
50. Workers' Compensation Appeals Board Opinion
51. Motion to Compel Supplementation of Discovery and Selection of Physician
52. Employee's Response to Employer's Motion to Compel Supplementation of Discovery and Selection of Physician
53. Notice of Withdrawal of Employer's Motion to Compel Supplementation of Discovery and Selection of Physician
54. Order Setting Case for Status Hearing
55. Order Setting Case for Status Hearing
56. Employer's Motion to Terminate Medical Benefits
57. Memorandum of Law in Support of Employer's Motion to Terminate Medical Benefits
58. Motion for Additional Time for Employee to Response to Employer's Motion to

13

Terminate Medical Benefits
59. Order Setting Case for Status Hearing
60. Employer's Response to Motion for Additional Time for Employee to Respond to Employer's Motion to Terminate Medical Benefits
61. Motion for Additional Discovery
62. Employer's Response to Motion for Additional Discovery
63. Order Granting Motion for Additional Discovery
64. Request for Expedited Hearing
65. Employee's Response to Employer's Motion to Terminate Medical Benefits
66. Docketing Notice
67. Request for Consideration
68. Employer's Objection to Request for Consideration
69. Objection to Rule 72 Sworn Declaration of Joseph L. Miehlich, II
70. Order Granting Request for Consideration
71. Employer's Response to Employee's Objection to Rule 72 Sworn Declaration of Joseph L. Miehlich, II
72. Employer's Expedited Hearing Position Statement
73. Employee's Response to Employer's Expedited Hearing Position Statement
74. Employer's Objection to Employee's Response to Employer's Expedited Hearing Statement
75. Response to Employer's Objection to Employee's Response to Employer's Expedited Hearing Position Statement
76. Expedited Hearing Order
77. Notice of Appeal
78. Workers' Compensation Appeals Board Opinion
79. Notice of Appeal, Tennessee Supreme Court
80. Order, Tennessee Supreme Court
81. Order Setting Case for Scheduling Hearing
82. Employer's Motion for Partial Summary Judgment on the Record
83. Employer's Statement of Undisputed Material Facts
84. Employer's Memorandum of Law in Support of Motion for Partial Summary Judgment on the Record
85. Response to Employer's Statement of Undisputed Material Facts
86. Employee's Additional Undisputed Material Facts to Employer
87. Brief in Opposition to Employer's Motion for Partial Summary Judgment
88. Employer's Responses to Employee's Additional Undisputed Material Facts to Employer
89. Order Denying Motion for Partial Summary Judgment
90. Employer's Motion for Partial Summary Judgment
91. Employer's Memorandum of Law in Support of Motion for Partial Summary

Judgment
92. Employer's Statement of Undisputed Material Facts
93. Brief in Opposition to Employer's Motion for Partial Summary Judgment
94. Response to Employer's Statement of Undisputed Material Facts
95. Employee's Additional Undisputed Material Facts to Employer
96. Employer's Responses to Employee's Additional Undisputed Material Facts to Employer
97. Order Denying Motion for Partial Summary Judgment
98. Order Setting Case for Scheduling Hearing
99. Order Setting Case for Scheduling Hearing
100. Order Setting Case for Scheduling Hearing
101. Order Setting Case for Scheduling Hearing
102. Scheduling Order
103. Employee's Tennessee Rule of Civil Procedure 26.02(4) Expert and Treating Physician Disclosure
104. Notice of Late Filed Exhibits
105. Employer's Vocational Expert Disclosure
106. Employer's Motion in Limine Seeking Exclusion of Employee's Vocational Expert Report
107. Employee's Response to Employer's Motion in Limine
108. Employee's Motion in Limine Seeking Exclusion of Employer's Vocational Report
109. Employer's Response to Employee's Motion in Limine Seeking Exclusion of Employer's Vocational Expert
110. Order on Pre-Trial Conference.
111. Joint Pre-Compensation Hearing Statement
112. Employer's Witness and Exhibit List
113. Employer's Compensation Hearing Brief
114. Employee's Pre-Hearing Brief

**CERTIFICATE OF SERVICE**

I certify that a copy of this Compensation Order was sent as indicated on July 6, 2023.

| Name | Certified Mail | Email | Service sent to: |
|---|---|---|---|
| Ronald J. Berke, Employee's Attorney | | X | ronnie@berkeattys.com margo@berkeattys.com |
| Charles E. Pierce, Employer's Attorney | | X | cepierce@mijs.com |

/s/Penny Shrum          w/permission JD
_____
Penny Shrum, Court Clerk
**WC.CourtClerk@tn.gov**

16

For notices of appeal filed on or after July 1, 2022.



<u>Compensation Order Right to Appeal</u>:

If you disagree with this Compensation Order, you may appeal to the Workers' Compensation Appeals Board. To do so, you must:

1. Complete the enclosed form entitled "Notice of Appeal" and file it with the Clerk of the Court of Workers' Compensation Claims *within thirty calendar days* of the date the Compensation Order was filed. When filing the Notice of Appeal, you must serve a copy upon the opposing party (or attorney, if represented).

2. You must pay, via check, money order, or credit card, a **$75.00 filing fee** *within ten calendar days* after filing the Notice of Appeal. Payments can be made in-person at any Bureau office or by U.S. mail, hand-delivery, or other delivery service. In the alternative, you may file an Affidavit of Indigency (form available on the Bureau's website or any Bureau office) seeking a waiver of the filing fee. You must file the fully-completed Affidavit of Indigency *within ten calendar days* of filing the Notice of Appeal. **Failure to timely pay the filing fee or file the Affidavit of Indigency will result in dismissal of your appeal.**

3. You are responsible for ensuring a complete record is presented on appeal. The Court Clerk will prepare the technical record and exhibits for submission to the Appeals Board, and you will receive notice once it has been submitted. If no court reporter was present at the hearing, you may request from the Court Clerk the audio recording of the hearing for a $25.00 fee. A licensed court reporter must prepare a transcript, and you must file it with the Court Clerk *within fifteen calendar days* of filing the Notice of Appeal. Alternatively, you may file a statement of the evidence prepared jointly by both parties *within fifteen calendar days* of filing the Notice of Appeal. The statement of the evidence must convey a complete and accurate account of the testimony presented at the hearing. The Workers' Compensation Judge must approve the statement of the evidence before the record is submitted to the Appeals Board. If the Appeals Board must review testimony or other proof concerning factual matters, the absence of a transcript or statement of the evidence can be a significant obstacle to meaningful appellate review.

4. After the Workers' Compensation Judge approves the record and the Court Clerk transmits it to the Appeals Board, a docketing notice will be sent to the parties. You have *fifteen calendar days* after the date of that notice to file a brief to the Appeals Board. *See the Rules governing the Workers' Compensation Appeals Board on the Bureau's website*

***For self-represented litigants: Help from an Ombudsman is available at 800-332-2667.***

**If neither party timely files an appeal with the Appeals Board, the trial court's Order will become final by operation of law thirty calendar days after entry. Tenn. Code Ann. § 50-6-239(c)(7).**

*For self-represented litigants: Help from an Ombudsman is available at 800-332-2667.*



**NOTICE OF APPEAL**
Tennessee Bureau of Workers' Compensation
www.tn.gov/workforce/injuries-at-work/
wc.courtclerk@tn.gov | 1-800-332-2667

Docket No.: _____

State File No.: _____

Date of Injury: _____

_____

**Employee**

v.

_____

**Employer**

Notice is given that _____

*[List name(s) of all appealing party(ies).  Use separate sheet if necessary.]*

appeals the following order(s) of the Tennessee Court of Workers' Compensation Claims to the Workers' Compensation Appeals Board (check one or more applicable boxes and include the date file-stamped on the first page of the order(s) being appealed):

☐ Expedited Hearing Order filed on _____     ☐ Motion Order filed on _____

☐ Compensation Order filed on_____     ☐ Other Order filed on_____

issued by Judge _____.

**Statement of the Issues on Appeal**

Provide a short and plain statement of the issues on appeal or basis for relief on appeal:

_____

_____

_____

_____

**Parties**

**Appellant(s)** (Requesting Party): _____     ☐ Employer ☐ Employee

Address: _____     Phone: _____

Email: _____

Attorney's Name: _____     BPR#: _____

Attorney's Email: _____     Phone: _____

Attorney's Address: _____

*\* Attach an additional sheet for each additional Appellant \**

Employee Name: _____ Docket No.: _____ Date of Inj.: _____

**Appellee(s)** (Opposing Party): _____ ☐ Employer ☐ Employee

Appellee's Address: _____ Phone: _____

Email: _____

Attorney's Name: _____ BPR#: _____

Attorney's Email: _____ Phone: _____

Attorney's Address: _____

*\* Attach an additional sheet for each additional Appellee \**

## CERTIFICATE OF SERVICE

I, _____, certify that I have forwarded a true and exact copy of this Notice of Appeal by First Class mail, postage prepaid, or in any manner as described in Tennessee Compilation Rules & Regulations, Chapter 0800-02-21, to all parties and/or their attorneys in this case on this the _____ day of _____, 20 _____.

_____
*[Signature of appellant or attorney for appellant]*



**Tennessee Bureau of Workers' Compensation**
**220 French Landing Drive, I-B**
**Nashville, TN 37243-1002**
**800-332-2667**

## AFFIDAVIT OF INDIGENCY

I, _____, having been duly sworn according to law, make oath that because of my poverty, I am unable to bear the costs of this appeal and request that the filing fee to appeal be waived. The following facts support my poverty.

1. Full Name: _____    2. Address: _____

3. Telephone Number: _____    4. Date of Birth: _____

5. Names and Ages of All Dependents:

_____ Relationship: _____

_____ Relationship: _____

_____ Relationship: _____

_____ Relationship: _____

6. I am employed by: _____

My employer's address is: _____

My employer's phone number is: _____

7. My present monthly household income, after federal income and social security taxes are deducted, is:

$ _____

8. I receive or expect to receive money from the following sources:

| | | | |
|---|---|---|---|
| AFDC | $ _____ per month | beginning | _____ |
| SSI | $ _____ per month | beginning | _____ |
| Retirement | $ _____ per month | beginning | _____ |
| Disability | $ _____ per month | beginning | _____ |
| Unemployment | $ _____ per month | beginning | _____ |
| Worker's Comp. | $ _____ per month | beginning | _____ |
| Other | $ _____ per month | beginning | _____ |

LB-1108 (REV 11/15)                    RDA 11082

9. My expenses are:

Rent/House Payment $ _____ per month   Medical/Dental $ _____ per month

| | | | |
|---|---|---|---|
| Groceries | $ _____ per month | Telephone | $ _____ per month |
| Electricity | $ _____ per month | School Supplies | $ _____ per month |
| Water | $ _____ per month | Clothing | $ _____ per month |
| Gas | $ _____ per month | Child Care | $ _____ per month |
| Transportation | $ _____ per month | Child Support | $ _____ per month |
| Car | $ _____ per month | | |
| Other | $ _____ per month (describe: _____ ) | | |

10. Assets:

| | | |
|---|---|---|
| Automobile | $ _____ | (FMV) _____ |
| Checking/Savings Acct. | $ _____ | |
| House | $ _____ | (FMV) _____ |
| Other | $ _____ | Describe: _____ |

11. My debts are:

| Amount Owed | To Whom |
|---|---|
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |

**I hereby declare under the penalty of perjury that the foregoing answers are true, correct, and complete and that I am financially unable to pay the costs of this appeal.**

_____
APPELLANT

Sworn and subscribed before me, a notary public, this

_____ day of _____, 20_____.

_____
NOTARY PUBLIC

My Commission Expires: _____