

**FILED**
**Nov 17, 2023**
**01:27 PM(CT)**
**TENNESSEE**
**WORKERS' COMPENSATION**
**APPEALS BOARD**

# TENNESSEE BUREAU OF WORKERS' COMPENSATION
## WORKERS' COMPENSATION APPEALS BOARD

| | |
|---|---|
| Sheila D. Owens | ) Docket No. 2015-01-0401 |
| | ) |
| v. | ) State File No. 44323-2015 |
| | ) |
| Sitters, Etc., et al. | ) |
| | ) |
| | ) |
| Appeal from the Court of Workers' | ) |
| Compensation Claims | ) |
| Audrey A. Headrick, Judge | ) |

---

### Affirmed in Part, Modified in Part, and Certified as Final

---

This appeal, the fourth in this case, concerns the trial court's compensation order awarding permanent total disability benefits. The employee, a home health aide, was injured while catching a falling patient, causing pain in her neck, shoulder, and low back. The employer accepted the shoulder and back injuries but denied the compensability of the neck condition due to the employee's pre-existing cervical condition. In an earlier decision on the record, the trial court ordered the employer to provide medical benefits for the neck, and the employer appealed. We reversed that decision, holding that the employee had presented insufficient evidence to establish that she would likely prevail at trial in proving the compensability of her neck injury. On remand, the court held an in-person hearing to address the employee's neck injury, at which the employee presented lay testimony and an affidavit correcting a typographical error in the employee's physician's deposition, and the court again ordered medical benefits. The employer appealed again, and we affirmed. During the pendency of the second appeal, the employee underwent unauthorized neck surgery. The employer provided a panel pursuant to the affirmed court order, and the panel physician opined the employee's neck symptoms did not arise primarily from the work accident. Thereafter, the employer sought to terminate medical benefits for the neck, and the court found that the employee was not likely to prove that the work injury was the primary cause of the need for ongoing medical treatment for her neck symptoms. The employee appealed, and we affirmed the trial court's order. At trial, the employee presented additional medical proof from her neck surgeon, and the trial court found the employee's neck condition was primarily caused by the work injury. As a result, the court awarded additional temporary total disability benefits, past and future medical benefits, and permanent total disability benefits. The employer has appealed. Upon careful consideration of the record, we affirm the court's determinations regarding compensability,

1

permanent total disability benefits, and past medical expenses; we modify the award of temporary total disability benefits; and we certify the modified order as final.

Judge Meredith B. Weaver delivered the opinion of the Appeals Board in which Presiding Judge Timothy W. Conner and Judge Pele I. Godkin joined.

Charles E. Pierce, Knoxville, Tennessee, for the employer-appellant, Sitters, Etc.

Ronald J. Berke, Chattanooga, Tennessee, for the employee-appellee, Sheila D. Owens

## Factual and Procedural Background

This is the fourth appeal in this case. Sheila D. Owens ("Employee") was employed by Sitters, Etc. ("Employer") on June 9, 2015, when she attempted to prevent a patient from falling, resulting in pain and other symptoms in her neck, low back, and left shoulder. Employer accepted the shoulder and back injuries as compensable and provided physician panels, but it denied the compensability of the alleged neck condition, as Employee had previously undergone three cervical surgeries following a previous work injury with another employer.

Employee selected Dr. Rickey Hutcheson for treatment of her back and Dr. Robert Mastey for treatment of her shoulder. Dr. Hutcheson reviewed an MRI of the lumbar spine when he first examined Employee in August 2015. He diagnosed her with a lumbar strain and prescribed physical therapy before releasing her at maximum medical improvement on January 26, 2016, with a one percent impairment. He also assigned restrictions consistent with her functional capacity evaluation, which he testified placed her in the "light duty" category of work.

Dr. Mastey had previously treated Employee for carpal tunnel syndrome following one of her neck fusions in 2004. After this work injury, he reviewed Employee's shoulder MRI and diagnosed Employee with an "undersurface" tear. Employee underwent a course of conservative treatment with physical therapy and an injection, and reported some improvement, but she declined to undergo surgery due to issues she was having in her neck. Dr. Mastey placed Employee at maximum medical improvement for her shoulder on December 7, 2016, and assigned a three percent impairment, although he indicated in his November 2017 deposition that shoulder surgery may still be a possibility, depending on what treatment Employee received for her neck. He declined to offer an opinion on causation of Employee's neck condition, deferring to the physician treating her neck.

In March 2016, Employee sought treatment of her neck on her own with Spine Surgery Associates on referral from her primary care physician. Her initial treatment was with Dr. Alexander Roberts, a physical medicine and rehabilitation physician. She complained of pain in her cervical spine and bilateral upper extremities as well as

2

numbness and tingling. She related a history of three prior cervical surgeries in 2002, 2004, and 2008. Dr. Roberts ordered bilateral nerve conduction studies and EMGs, as well as a cervical CT and MRI. The MRI revealed degenerative disc disease at C3-C4 and C5-C6, a disc bulge with overlapping central disc protrusion at C3-C4, and bilateral stenosis at C3-C4, C5-C6, and C7-T1. The EMG and nerve conduction studies revealed "electrodiagnostic evidence of a right C5 and C6 radiculopathy with active denervation." Based upon these findings, Dr. Roberts referred Employee to Dr. Charles Pearce, an orthopedic surgeon within the same practice.

Dr. Pearce, who was not authorized by Employer as a treating physician, first saw Employee July 14, 2016, and recommended surgery at C3-C4. Although he believed her lower cervical spine may need surgical treatment at some point in the future, he felt cord compression at C3-C4 was causing most of her symptoms. Dr. Pearce partially completed a questionnaire from Employee's attorney, marking "yes" in response to whether the need for the recommended surgery was caused by "the old condition being aggravated by the new injury." Meanwhile, Employer had Employee evaluated by orthopedist Dr. Jay Jolley. Dr. Jolley examined Employee in December 2016, reviewed diagnostic testing completed both before and after the 2015 incident, and opined that her cervical issues were chronic and pre-existing. He further opined that, although the surgery recommended by Dr. Pearce was reasonable, it would not be primarily related to the 2015 work accident.

At his deposition, Dr. Pearce testified that the work accident Employee described caused an anatomic change to the pre-existing condition in her neck. He reviewed multiple prior diagnostic studies from 2003, 2007, 2008, and 2012 at the time of his deposition and stated:

> Based on the reports that you have, there [were] obviously some early anatomic changes, some maybe degenerative changes, some bulging of the discs. Based on the MRI that I reviewed in 2016, the amount of cord compression and the size of the disc herniation [were] obviously much worse. And at what point that occurred between the last MRI of 2012 versus 2016 I cannot say, except, based on her history, that she started having symptoms, and now we have a new MRI which shows a definite anatomic change.

Dr. Pearce further agreed that Employee's neck condition could have worsened without any symptoms between the prior studies and the reported work incident but testified the anatomic change and need for surgery were "proximally caused" by the work incident.

Dr. Jolley was also deposed, and, although he did not have the diagnostic study from 2012, he testified that study would not impact his opinion regarding causation. He opined that Employee's degenerative condition was the cause of her pain and that the stenosis located at C3-C4 was her "main issue" rather than any disc herniation. He classified her

3

degeneration and arthritis at C3-C4 as "overwhelming" and stated the reported work accident and aggravation were not more responsible for her need for surgery than her pre-existing condition.

Following those expert depositions, in March 2018, the court issued a decision on the record requiring Employer to provide a panel to Employee for treatment of her neck. Employer appealed that order, and we reversed the trial court's decision in May 2018, determining that Dr. Pearce's statement that the work injury was the "proximal" cause of her condition was ambiguous, and the totality of the evidence presented at the hearing was insufficient to meet Employee's burden of proof. *See Owens v. Sitters, Etc.*, No. 2017-01-0401, 2018 TN Wrk. Comp. App. Bd. LEXIS 26 (Tenn. Workers' Comp. App. Bd. May 29, 2018).

Employee's counsel, believing the word "proximally" to be a transcription error, sought clarification from the court reporter who transcribed Dr. Pearce's deposition. The court reporter submitted an affidavit stating that the word "proximal" in the transcript of Dr. Pearce's deposition was an error and that the correct word was "proximate." Employee requested an expedited hearing in January 2019, again seeking medical benefits for her neck. At that hearing, Employee submitted the court reporter's affidavit, the previously-obtained medical testimony, her own testimony, and the testimony of several lay witnesses. The court issued another order compelling Employer to provide medical benefits for the cervical spine, and Employer again appealed. While the appeal was pending, in April 2019, Employee elected to undergo the surgery recommended by Dr. Pearce. We subsequently affirmed the trial court's order awarding medical benefits for the neck in June 2019. *See Owens v. Sitters, Etc.*, No. 2017-01-0401, 2019 TN Wrk. Comp. App. Bd. LEXIS 27 (Tenn. Workers' Comp. App. Bd. June 28, 2019).

Following our decision in the second appeal, Employer provided Employee a panel of physicians. Employee selected Dr. J. Alex Sielatycki from the panel, and he evaluated her on March 12, 2020.[1] Following his review of the diagnostic testing and his examination of Employee, Dr. Sielatycki opined that Employee's "ongoing neck pain is likely related to pseudoarthrosis at C5-7 and anteriolisthesis of C7-T1 causing foraminal narrowing and likely causing some of her hand symptoms." He confirmed there was a disc protrusion on the April 2012 MRI at C3-C4 and, thus, the work accident did not cause the protrusion. He noted, however, that the "onset of symptoms from the C3-C4 disc could have been worsened and exacerbated by the work injury, and we can only rely on the patient's report to make this determination." Employer also sent Dr. Sielatycki a questionnaire, and, in his responses, Dr. Sielatycki reiterated his opinion that Employee's complaints as of the time he saw her were due to pseudoarthrosis. However, when asked whether Employee's "April

---

[1] There is no explanation in the record why it took almost nine months after we issued our opinion in June 2019 to obtain an appointment for Employee to see a panel physician in March 2020.

4

2019 cervical surgery was primarily (more than 50%) the result of cervical conditions pre-existing her June 9, 2015 work injury," Dr. Sielatycki responded, "No." He explained:

> The disc herniation was present prior to the 2015 incident. However[,]treatment is based on symptoms, not MRI alone, thus, [the] onset of symptoms of myelopathy would cause the need for [surgery]. Report of when those symptoms arose is subjective.

In his deposition, Dr. Sielatycki testified consistently with Dr. Pearce that, based on the imaging, it did not appear Employee had healed completely from her prior fusions. He believed her pre-existing condition to be the primary cause of her neck pain and the numbness and tingling in her hands. He further testified that he could not confirm whether the June 2015 work incident caused an anatomic change, but he acknowledged that it did cause symptoms, stating "[t]he only . . . way to confirm anatomic changes without question would have been an MRI immediately previously, prior, to the injury in question and an MRI immediately following, which we don't have, so we have to rely on the patient's history." He observed that the herniation at C3-C4 was larger in 2016 than it had been in 2012 and that it did "have the appearance of a soft-disc herniation, which does typically suggest a more recent onset and a more acute event." He further agreed that his testimony "supports the opinion that trauma produced this aggravation of [Employee's] pre[-]existing injury."

Employer filed a Motion to Terminate Medical Benefits, and the court, in a decision on the record, granted the motion in March 2021. The court determined Dr. Sielatycki, as a panel-selected treating physician, was entitled to a presumption of correctness rebuttable by a preponderance of the evidence regarding causation under Tennessee Code Annotated section 50-6-102(14)(E). Furthermore, although the court did not find his opinion sufficient to alter the court's prior finding that the injury at C3-C4 was caused by the June 2015 accident, it did conclude, based on the totality of the evidence, that Employee was unlikely to show that her need for ongoing treatment for her neck was primarily related to the June 2015 work injury. Employee appealed, and we affirmed, concluding Dr. Sielatycki's opinion on the need for treatment was entitled to a presumption of correctness, which Employee had not rebutted. *See Owens v. Sitters, Etc.*, No. 2017-01-0401, 2021 TN Wrk. Comp. App. Bd. LEXIS 13 (Tenn. Workers' Comp. App. Bd. May 12, 2021).

On remand, the parties deposed Dr. Pearce again, this time regarding Employee's medical treatment, maximum medical improvement, and impairment rating. He testified that, in his opinion, "it was greater than 50% more likely than not that her symptoms and the necessity of the surgery [at C3-C4 were] due to the [work] injury." Although he had previously assigned a twelve percent permanent impairment rating, he revised that to thirteen percent at his deposition. With respect to restrictions, Dr. Pearce testified that he would need her to complete a functional capacity evaluation. He commented that she "would have to be careful with any type of job condition that would require a lot of

5

dexterity, or you know, heights, ladders, things like that" and that Employee was limited to sedentary work in his opinion.

At the June 23, 2023 compensation hearing, Employee and four lay witnesses testified regarding her current lifestyle and capabilities, and she presented the testimony of vocational expert John McKinney in support of her claim. Employer presented the testimony of vocational expert Michelle Weiss. Employee testified she was not working and had not applied for any positions, although she would like to return to being a caregiver if she could. She explained that she had difficulty staying awake while on her pain medication. She further stated that she could no longer help take care of her grandchildren or perform yardwork and that she frequently drops items. Though she admitted she was already in pain management at the time of the work injury, she testified to increased pain and difficulty performing physical tasks after this work injury. Her employment history included factory work, cafeteria work in a hospital, and work as a sitter/caregiver. Although Employee graduated from high school, Mr. McKinney testified that she functioned at a below-average intellectual level and that, considering her sedentary work restrictions, experience, and education, she was "totally vocationally disabled." During her testimony, Ms. Weiss noted that Employee had borderline learning ability and that she was uncertain of Dr. Pearce's meaning regarding the dexterity restrictions. She testified that if Dr. Pearce's dexterity restriction limited Employee to occasional hand use only, she would be totally disabled. If, in the alternative, Employee was able to use her hand for work activities frequently, Ms. Weiss testified she would have a vocational disability of sixty-four percent. Both experts agreed she would not be able to return to her prior position.

At trial, the court found Dr. Pearce's opinion was more persuasive than the opinions of Dr. Jolley and Dr. Sielatycki. It determined Dr. Sielatycki's opinion was not entitled to a presumption of correctness regarding causation under Tennessee Code Annotated section 50-6-102(12)(E) because he did not "treat" Employee. It also concluded, however, that, even if his causation opinion were presumed correct, Dr. Pearce's testimony overcame that presumption. As such, it ordered Employer to pay for the surgery performed by Dr. Pearce and awarded additional temporary total disability benefits from January 12, 2018, to July 2, 2020, when Dr. Pearce placed Employee at maximum medical improvement. It further found Employee to be credible regarding her capabilities and inability to work and awarded permanent total disability benefits under Tennessee Code Annotated section 50-6-207(4)(A)(i). In doing so, it construed Dr. Pearce's restriction to "avoid" jobs requiring "a lot of dexterity" to mean Employee was limited to "occasional" hand use. The court reiterated that both vocational experts testified that Employee was one hundred percent vocationally disabled under those circumstances. Employer has appealed.

**Standard of Review**

The standard we apply in reviewing a trial court's decision presumes that the court's factual findings are correct unless the preponderance of the evidence is otherwise. *See*

6

Tenn. Code Ann. § 50-6-239(c)(7) (2022). When the trial judge has had the opportunity to observe a witness's demeanor and to hear in-court testimony, we give considerable deference to factual findings made by the trial court. *Madden v. Holland Grp. of Tenn., Inc.*, 277 S.W.3d 896, 898 (Tenn. 2009). However, "[n]o similar deference need be afforded the trial court's findings based upon documentary evidence." *Goodman v. Schwarz Paper Co.*, No. W2016-02594-SC-R3-WC, 2018 Tenn. LEXIS 8, at *6 (Tenn. Workers' Comp. Panel Jan. 18, 2018). Similarly, the interpretation and application of statutes and regulations are questions of law that are reviewed *de novo* with no presumption of correctness afforded the trial court's conclusions. *See Mansell v. Bridgestone Firestone N. Am. Tire, LLC*, 417 S.W.3d 393, 399 (Tenn. 2013). We are also mindful of our obligation to construe the workers' compensation statutes "fairly, impartially, and in accordance with basic principles of statutory construction" and in a way that does not favor either the employee or the employer. Tenn. Code Ann. § 50-6-116 (2022).

**Analysis**

On appeal, Employer contends the court erred in (1) its determination that Dr. Sielatycki's opinion was not entitled to a presumption of correctness regarding causation; (2) finding the neck injury compensable; (3) determining Employee was permanently and totally disabled; (4) awarding reimbursement for the unauthorized neck surgery; and (5) awarding past temporary total disability benefits.[2] Employee responded that the court's findings were correct and should not be disturbed on appeal.

*Presumption of Correctness*

First, in considering the expert opinions regarding the primary cause of the neck condition and the need for cervical spine surgery, the court determined that Dr. Sielatycki's opinion was not entitled to a presumption of correctness despite having been selected from a panel. In making that finding, the court stated that "he never acted as a treating physician and instead documented her one-time visit as a second opinion." Tennessee Code Annotated section 50-6-102(12)(E) states:

> The opinion of the treating physician, selected by the employee from the employer's designated panel of physicians pursuant to 50-6-204(a)(3), shall be presumed correct on the issue of causation but this presumption shall be rebuttable by a preponderance of the evidence.

In reaching its conclusion, the court disregarded its prior determination in its March 4, 2021 expedited hearing order that Dr. Sielatycki's opinion *was* entitled to a presumption of correctness under the statute. That order was appealed by Employee, and we affirmed the

---

[2] At trial, Employer also challenged whether Employee gave proper notice of the alleged neck injury, and the court determined that Employee gave proper notice. That determination was not appealed.

court's determinations, including its finding that the presumption of correctness applied. No new evidence was submitted at trial regarding Dr. Sielatycki's opinions, and the court relied on the same deposition and report that were in the record at both hearings. While Dr. Sielatycki himself may have characterized the visit as a second opinion, he was selected from a panel that Employer provided pursuant to a court order compelling the provision of medical benefits. There is no evidence in the record Employer limited the scope of Dr. Sielatycki's evaluation to a second opinion only or that it instructed Dr. Sielatycki that he was not authorized to provide treatment for any condition he deemed to be causally related to the work accident. In short, the fact that Dr. Sielatycki ultimately opined that her neck symptoms did not arise primarily from the work accident did not change his status from that of a treating physician to that of an evaluating physician only. As such, we conclude the trial court erred in determining Dr. Sielatycki's opinion was not entitled to a presumption of correctness. That finding, however, does not end the inquiry. We must also determine whether the trial court's error regarding the presumption of correctness was reversible error.

*Compensability*

As noted above, the court concluded the opinion of Dr. Pearce was more persuasive on the issue of causation than the opinions of the other testifying doctors, including that of Dr. Sielatycki. In footnote 3 of its compensation order, the court noted that its opinion "remains the same even if viewing Dr. Sielatycki as a physician entitled to the presumption of correctness." Although this statement alone is insufficient to support a finding that Employee rebutted the presumption as outlined in section 102(12)(E), the court also discussed the various expert opinions, credentials, experience, and relationships of the testifying physicians to Employee in making its determination. As we have previously stated,

> a reviewing court can review documentary evidence, including expert depositions, *de novo* in order to determine where the preponderance of the evidence lies. However, with respect to the trial court's ultimate determination, a reviewing court should acknowledge the trial court's discretion to evaluate which expert's opinion is entitled to greater weight based on the totality of the evidence presented to the court and is to review such a determination under an abuse of discretion standard.

*Johnson v. Inspire Brands d/b/a Blazin Wings, Inc.*, No. 2020-08-0731, 2022 TN Wrk. Comp. App. Bd. LEXIS 35, at *18 (Tenn. Workers' Comp. App. Bd. Sept. 7, 2022). Using this standard, we conclude the preponderance of the evidence supports the trial court's finding that Dr. Pearce's testimony rebutted the presumption of correctness which should have been accorded Dr. Sielatycki's causation opinion and that Employee's neck injury is compensable.

Although Dr. Sielatycki's opinion is presumed correct on the issue of causation, his report and testimony were equivocal on the primary cause of the cervical herniation and symptomology at C3-C4. He noted that the disc bulge at C3-C4 pre-existed the work injury but that it was more pronounced in 2016, after the work accident. He testified that the *only* way to determine if an anatomic change occurred due to the injury would be if Employee had undergone an MRI immediately before and immediately after the incident. He further stated that the herniation at C3-C4 had "the appearance of a soft-disc herniation, which does typically suggest a more recent onset and a more acute event." Although he opined as to the cause of Employee's neck complaints at the time he evaluated her in March 2020, he did not provide any definitive testimony as to whether the pre-existing neck condition was aggravated or advanced by the 2015 work injury. During his deposition, he also acknowledged that his stated opinions could support a finding that there was an aggravation caused by the 2015 work accident. In short, our review of the record does not reveal that Dr. Sielatycki offered a definitive opinion regarding the cause of Employee's cervical spine condition and the need for surgery.

Dr. Jolley, who performed an examination at Employer's request, repeatedly stated that the neck condition was chronic and that, although surgery was necessary, the work injury was not more responsible for that surgery than her pre-existing condition. However, he did agree that "some aggravation" occurred due to the work injury and, at one point, answered in the affirmative when asked if he agreed with Dr. Pearce's opinion expressed in his response to Employee's counsel's questionnaire, namely that Employee's need for surgery was "[caused] by the old condition being aggravated by the new injury." In contrast, Dr. Pearce testified in his first deposition that the work injury was the "proximate" cause of Employee's need for surgery at C3-C4. He later testified that it was more than fifty percent likely Employee's symptoms and her need for surgery were due to the work injury.

Neither Dr. Jolley's nor Dr. Pearce's opinion is entitled to a presumption of correctness, as neither was selected from a panel pursuant to subsection 50-6-204(a)(3). In considering conflicting expert opinions, the trial court generally has the discretion to choose which opinion to accredit in making its decision. *See Brees v. Escape Day Spa & Salon*, No. 2014-06-0072, 2015 TN Wrk. Comp. App. Bd. LEXIS 5, at *14 (Tenn. Workers' Comp. App. Bd. Mar. 12, 2015). In doing so, the court should consider "the qualifications of the experts, the circumstances of their examination, the information available to them, and the evaluation of the importance of that information through other experts." *Id.* (citing *Orman v. Williams Sonoma, Inc.* 803 S.W.2d 672, 676 (Tenn. 1991)). In this case, the trial court noted Dr. Pearce was a board-certified physician who had practiced for thirty years and had treated Employee over the course of several years. He also had reviewed all the known records regarding Employee's prior neck surgeries and treatment. Dr. Jolley, also board-certified and with fourteen years of experience, did not have all the records and only saw Employee once. Furthermore, the court concluded Dr. Jolley ultimately agreed that Employee experienced an aggravation of her pre-existing

9

condition.[3]  As such, it accepted the opinion of Dr. Pearce as the most reliable.  Although we disagree with the trial court's characterization of Dr. Jolley's testimony and its decision not to accord Dr. Sielatycki's causation opinion a presumption of correctness, we nevertheless find no abuse of discretion in its conclusion that Employee's neck injury was compensable based on the totality of the record, including Dr. Pearce's causation opinion.[4]

*Permanent Total Disability*

Employer next contends that even if the neck injury is compensable, an award of permanent total disability is not supported by a preponderance of the evidence.  A permanent total disability award is appropriate "[w]hen an injury not otherwise specifically provided for in this chapter totally incapacitates the employee from working at an occupation that brings the employee an income."  Tenn. Code Ann. § 50-6-207(4)(B) (2022).  Prior to the passage of the 2013 Workers' Compensation Reform Act, the Tennessee Supreme Court determined that, to assess whether an individual is permanently and totally disabled, a court must look to "a variety of factors such that a complete picture of an individual's ability to return to gainful employment is presented."  *Hubble v. Dyer Nursing Home*, 188 S.W.3d 525, 535 (Tenn. 2006) (citing *Vinson v. United Parcel Serv.*, 92 S.W.3d 380, 386 (Tenn. 2002)).  Factors the court should consider include "the employee's skills and training, education, age, local job opportunities, and his [or her] capacity to do work at the kinds of employment available in his [or her] disabled condition."  *Cleek v. Wal-Mart Stores, Inc.*, 19 S.W.3d 770, 774 (Tenn. 2000) (quoting *Roberson v. Loretto Casket Co.*, 722 S.W.2d 380, 384 (Tenn. 1986)).  Although this assessment can be made and presented at trial by a vocational expert, "it is well settled that despite the existence or absence of expert testimony, an employee's own assessment of his or her overall physical condition, including the ability or inability to return to gainful employment, is 'competent testimony that should be considered.'"  *Vinson*, 92 S.W.3d at 386 (quoting *Cleek*, 19 S.W.3d at 774).

Here, two vocational experts testified as to the degree of Employee's vocational disability following her work injury.  The trial court found them to be equally qualified.  It noted that Mr. McKinney considered the restrictions of both Dr. Hutcheson and Dr. Pearce to support his opinion that Employee was one hundred percent vocationally disabled.  Ms.

---

[3] Specifically, the trial court stated, "Dr. Jolley agreed that the need for the surgery was caused by the aggravation of a pre-existing condition."  We conclude, however, that this is an oversimplification of Dr. Jolley's testimony as a whole.  Dr. Jolley also testified that, although there was "some degree of aggravation," he could not say that "the incident is more responsible for her need of surgery."  Although he answered in the affirmative later when asked, "Yes or no, do you agree with Dr. Pearce's statement [that the need for surgery 'was caused by the old condition being aggravated by the new injury']," he also testified that Employee's condition is chronic in nature and not due to the 2015 work injury.

[4] Consequently, we also conclude the trial court's error in not applying a presumption of correctness to Dr. Sielatycki's causation opinion was harmless under these circumstances.

Weiss considered each physician's restrictions separately and assessed Employee with a forty-four percent disability relative to Dr. Hutcheson's restrictions. Regarding the restrictions of Dr. Pearce, Ms. Weiss testified Employee was sixty-four percent vocationally disabled if Dr. Pearce's dexterity restriction allowed for "frequent" hand use but agreed Employee was one hundred percent disabled if she was limited to only "occasional" hand use. Both experts agreed that, although she put forth a reliable effort in the testing, her academic performance was in the low or low-average range. The trial court construed Dr. Pearce's restriction for Employee "to avoid jobs requiring 'a lot of dexterity' to mean at a minimum 'occasional' hand use." Based on our review of Dr. Pearce's testimony, we find his statements regarding Employee's hand dexterity restrictions to be unclear and, in and of themselves, insufficient to be the basis of a permanent total disability award.

However, the trial court also heard testimony from Employee and four lay witnesses regarding her capabilities. Employee and the other lay witnesses testified there were numerous activities she previously enjoyed but could no longer do, such as shopping, traveling, painting, working around her home and yard, and caring for her grandchildren. In addition to experiencing chronic pain, Employee testified her medication makes her drowsy, causing her to fall asleep frequently. She was unaware of any employment where she would not be required to stay awake. The trial court found her testimony credible, and we give considerable deference to a trial court's credibility determinations. *See, e.g.*, *Moore v. Beacon Transport, LLC*, No. 2018-06-1503, 2021 TN Wrk. Comp. App. Bd. LEXIS 39, at *5 (Tenn. Workers' Comp. App. Bd. Oct. 29, 2021).

The court also heard considerable evidence from lay and expert witnesses regarding Employee's anticipated ability to return to an occupation that would bring her an income. Dr. Pearce testified that he believed Employee to be limited to sedentary work only. When that testimony is considered in conjunction with Dr. Hutcheson's restrictions, Employee's lay testimony regarding her physical limitations, and the record as a whole, we conclude the evidence preponderates in favor of the trial court's determination that Employee is permanently and totally disabled.

*Medical Bills*

Employer has also appealed the award of medical expenses for unauthorized treatment. While the interlocutory appeal of the trial court's second order awarding medical benefits was pending, Employee elected to undergo the surgery recommended by Dr. Pearce without authorization from Employer. Generally, an employer is not responsible for payment for unauthorized medical treatment unless the employee establishes he or she was justified in obtaining the medical treatment without the employer's approval and the treatment was reasonable and necessary. *Gray v. Wingfoot Commer. Tire Sys.*, No. W2017-00380-SC-WCM-WC, 2018 Tenn. LEXIS 239, at *19-20 (Tenn. Workers' Comp. Panel, May 21, 2018). Additionally, Tennessee Code Annotated

section 50-6-204 "makes it clear that the intent [of the Legislature] . . . was for the employee to certainly do no less than consult his employer before incurring the expenses called for by that statute if the employee expects the employer to pay for it. The opposite would seem to be against public policy." *Buchanan v. Mission Ins. Co.*, 713 S.W.2d 654, 658 (Tenn. 1986) (internal citations omitted). However, "an employer who elects to deny a claim for workers' compensation benefits bears the risk of being held responsible for medical expenses incurred by the employee in the event the court later determines that such benefits were owed." *Barrett v. Lithko Contracting, Inc.*, No. 2015-06-0186, 2016 TN Wrk. Comp. App. Bd. LEXIS 93, at *8 (Tenn. Workers' Comp. App. Bd. Dec. 8, 2016).

In the present case, Dr. Pearce initially recommended surgery in July 2016. In a decision on the record, the trial court ordered Employer to provide a panel of physicians for treatment of Employee's neck condition in March 2018. We reversed that order in May 2018, and the parties did not have another expedited hearing until January 2019. The trial court again ordered Employer to provide a panel and Employer again appealed the order. Our order affirming the trial court was issued in June 2019, two months after Employee had the surgery.

There is no evidence in the record establishing whether Employee or her counsel contacted Employer during the pending appeal of the second order to advise she intended to proceed with the surgery. However, Employee had been seeking authorization for the surgery since 2016, and Employer had continuously denied any benefits for her neck condition. Indeed, Employee had sought the treatment at an expedited hearing in January 2019 and received a court order for medical benefits. Furthermore, Dr. Pearce stated in his first deposition that "[i]f the cord compression continues or gets worse, it could lead to some permanent neurologic problems." In his second deposition, he testified when Employee returned to him in March 2019 with ongoing symptoms, he "felt like at that time . . . this was more of an urgent matter with the spinal cord compression and changes" and, as such, proceeded with scheduling surgery. He further testified the surgery and associated expenses were reasonable and necessary. Given these circumstances, we conclude Employee was reasonable in obtaining the unauthorized treatment despite Employer's denial of same, and the trial court did not err in ordering the reimbursement of the expenses arising from the surgery.

*Temporary Total Disability Benefits*

Finally, Employer disputes the trial court's award of temporary total disability benefits from January 12, 2018, through July 2, 2020. Temporary total disability benefits are required when "(1) the worker became disabled from working due to a compensable injury; (2) there is a causal connection between the injury and the inability to work; and (3) the worker established the duration of the period of [the] disability." *Jones v. Crencor Leasing and Sales*, No. 2015-06-0332, 2015 TN Wrk. Comp. App. Bd LEXIS 48, at *7

(Tenn. Workers' Comp. App. Bd. Dec. 11, 2015) (citing *Simpson v. Satterfield*, 564 S.W.2d 953, 955 (Tenn. 1978)).

The trial court determined the date when temporary total disability benefits should have begun based on Dr. Pearce's January 12, 2018 deposition, wherein the following exchange occurred between Employee's counsel and Dr. Pearce:

Q:   And insofar as her restrictions until she has the surgery?

A:   She would be restricted from any type of high-impact work, any type of manual-type work, anything – you know, staying off of ladders, any high-risk fall situations.

Dr. Pearce was deposed again in 2023, and Employee's counsel asked what restrictions he would give for "this 2015 injury." Dr. Pearce stated that she "would have to be careful with any type of job condition that would require a lot of dexterity, or you know, heights, ladders, things like that" and then elaborated that, in his opinion, she was limited to sedentary work. However, there is no line of questioning in the deposition establishing when those restrictions began post-surgery, and Dr. Pearce's medical records do not contain any work restrictions post-surgery. In a May 2, 2019 note, Dr. Pearce commented only that "[t]he patient asked questions regarding the appropriate level of activity for [her]. [She] was informed about the activities that are appropriate for [her] to perform and the activities which [she] should avoid."

Although we have previously held that a treating physician's delay in assigning restrictions does not absolve an employer of its obligation to pay temporary total disability benefits, an employee must still establish the duration of any period of temporary disability through competent evidence. *See McKim v. Stansell Electric Company, Inc.*, No. 2022-07-0215, 2023 TN Wrk. Comp. App. Bd. LEXIS 11 (Tenn. Workers' Comp. App. Bd. Feb. 22, 2023). We conclude Employee did not meet her burden of proving what work restrictions, if any, were in place between the date of surgery on April 8, 2019, and maximum medical improvement on July 2, 2020. Accordingly, we modify the trial court's order to award temporary total disability benefits for the period she established she was under restrictions prior to the surgery and unable to work. Thus, Employee is entitled to temporary total disability benefits from January 12, 2018 to April 8, 2019, a period of 64.57 weeks equating to an award of $9,063.69 at her stipulated compensation rate of $140.37 per week.

## Conclusion

For the foregoing reasons, we modify the trial court's order regarding the award of temporary disability benefits, affirm the trial court's order in all other respects, and certify the modified order as final. Costs on appeal are taxed to Employer.

13



# TENNESSEE BUREAU OF WORKERS' COMPENSATION
# WORKERS' COMPENSATION APPEALS BOARD

| | | |
|---|---|---|
| Sheila D. Owens | ) | Docket No. 2015-01-0401 |
| | ) | |
| v. | ) | State File No. 44323-2015 |
| | ) | |
| Sitters, Etc., et al. | ) | |
| | ) | |
| | ) | |
| Appeal from the Court of Workers' | ) | |
| Compensation Claims | ) | |
| Audrey A. Headrick, Judge | ) | |

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the Appeals Board's decision in the referenced case was sent to the following recipients by the following methods of service on this the 17th day of November, 2023.

| Name | Certified Mail | First Class Mail | Via Fax | Via Email | Sent to: |
|---|---|---|---|---|---|
| Ronald J. Berke<br>Margo Hixson | | | | X | ronnie@berkeattys.com<br>margo@berkeattys.com<br>stacy@berkeattys.com |
| Charles E. Pierce<br>Alex B. Morrison<br>Chris G. Rowe | | | | X | cepierce@mijs.com<br>abmorrison@mijs.com<br>cgrowe@mijs.com |
| Audrey A. Headrick, Judge | | | | X | Via Electronic Mail |
| Kenneth M. Switzer, Chief Judge | | | | X | Via Electronic Mail |
| Penny Shrum, Clerk, Court of Workers' Compensation Claims | | | | X | penny.patterson-shrum@tn.gov |



Olivia Yearwood
Clerk, Workers' Compensation Appeals Board
220 French Landing Dr., Ste. 1-B
Nashville, TN 37243
Telephone: 615-253-1606
Electronic Mail: WCAppeals.Clerk@tn.gov